**Robert Wesley KNIGHTON, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–90–1326.**

Court of Criminal Appeals of Oklahoma.

Jan. 8, 1996.

Rehearing Denied Feb. 28, 1996.

Cheryl A. Ramsey, Szlichta, Ramsey & Meyers, Stillwater, Nikki G. Leach, Perry, Defense Counsel, for Appellant at trial.

Joseph A. Wideman, District Attorney, Mark Gibson, Assistant District Attorney, Perry, Prosecutor for State at trial.

Cindy G. Brown, Asst. Appellate Indigent Defender, Norman, for Appellant on appeal.

Susan Brimer Loving, Attorney General of Oklahoma, A. Diane Blalock, Assistant Attorney General, Oklahoma City, for State on appeal.

### OPINION

LANE, Judge:

Robert Wesley Knighton, appellant, was tried by jury and convicted of two counts of Murder in the First Degree in violation of 21 O.S.1981, § 701.7 in Noble County District Court Case No. CRF–90–1. Following the second-stage proceeding the jury found three aggravating factors: the defendant was previously convicted of felonies involving the use or threat of violence to the person; the defendant knowingly created a great risk of death to more than one person, and there exists the probability that the defendant would commit future criminal acts of violence that would constitute a continuing threat to society. See 21 O.S.1981, § 701.12(1), (2) and (7). The jury set punishment at death for each count, and the trial court sentenced accordingly.

Appellant is before us on original appeal. We affirm judgment and sentence.

### FACTS

This case arises out of the murder of Richard and Virginia Denny in their rural Noble County home. The murders occurred on the third day of a four-day crime spree which began in Kansas City, Missouri and ended in Canadian, Texas.

Three friends, Knighton, his girlfriend, Renee Williams, and Lawrence Brittain decided to run away from Kansas City to California or Florida because seventeen-year-old Brittain was going to be transferred from a light security correctional facility to a secure facility. Forty-eight year old Knighton, the leader of the group, told Brittain and twenty year old Williams, "there would be robberies and maybe even murders" along the way.

Knighton stole a van and they drove to his mother's home in Springfield, Missouri. She gave them money, and the next day they drove to the Clinton, Missouri home of Brittain's friend, Frank Merrifield. Merrifield was home, drinking with his friend Ray Donahue. Merrifield showed Knighton his gun collection and invited Knighton to shoot a pearl handled, .22 caliber pistol. Knighton shot it—into the back of Donahue's head. Before Merrifield realized what had happened, Knighton shot and killed him. The three left after taking money and two pistols from the dead men. They took the .22 that Knighton had just used to kill Donahue and Merrifield, and a .38 that Knighton would use two days later to kill the Dennys.

From Springfield, the three drove south to Oklahoma. Knighton was concerned that they had driven the stolen van too long, and

tried unsuccessfully in Tulsa and Sand Springs to steal another vehicle. Still wanting to change vehicles, they kept driving west, looking for an isolated home to "take over". "Taking over" a home meant, as Williams would testify at trial, killing the occupants and taking what they wanted.

As the three drove through rural Noble County, Knighton told Brittain he would do the next job because he needed to "grow up". Brittain and Williams began casing homes as they drove by. They paused at a home down the road from the Denny's, but rejected it when they thought they saw a child and toys in the yard. They did not want to kill children.[1]

They drove on, and when they turned into the driveway of Richard and Virginia Denny's home, sixty-two-year-old Richard Denny came out to meet them. Brittain got out of the van and asked Denny for directions to Bristow. When Denny went to his pickup to get a map, Brittain froze and could not pull the .22 out from under his jacket. Knighton stepped in, held the .38 to the back of Denny's head and marched him inside. Virginia Denny was sitting at the kitchen table eating potato chips.

Denny advised his wife they should do what they were told. She offered Knighton and Brittain milk; they wanted beer. Denny sat down and tried to bargain with Knighton. Denny explained Knighton didn't have to kill them. He could take anything he wanted and they didn't have a phone, so they couldn't report him. Knighton told the Dennys several times that he didn't "want to have to" kill them. Then after a while Knighton offered Brittain the chance to shoot. Brittain declined and Knighton shot Mr. Denny in the chest. Then he shot Mrs. Denny in the chest and shot Mr. Denny a second time. Knighton later told Williams, "at least the old woman had time to say her prayers."

Knighton and Brittain went outside, then Brittain went back in and got the keys to the Denny's pickup from the pocket of Mr. Denny's overalls. Williams and Brittain wiped down the van they had been driving and

abandoned it nearby. The three drove the Denny's gold colored pickup west to Canadian, Texas.

Knighton again believed they had driven the stolen truck long enough, so they began looking for another home to take over. Debbie Clark drove up behind them on her way home from taking children to school and noticed they were driving extremely slowly on her street. She saw them look intently between the houses, and then look menacingly at her. She went home and watched them from her living room window. When they circled her block a third time, she called the sheriff's office.

Hemphill County Deputy Sheriff Tennant stopped them as a result of Clark's call. Knighton could not produce any identification. When Deputy Tennant asked him to identify his passengers, Knighton gave conflicting stories. The Sheriff arrived and asked Williams and Brittain to get out of the truck. When they did, the Sheriff saw a pistol in plain view on the floorboard. He then saw the handle of a partially covered second pistol on the seat. The three were then arrested. The Hemphill County Sheriff had the Noble County Sheriff called based on the proof of insurance form in the Denny's truck. The Noble County Sheriff sent people to the Denny place, and the murders were discovered.

## I. JURY SELECTION

Appellant relies on *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) to argue the trial court applied an improper standard in refusing to remove two veniremen for cause. These veniremen were unfit, appellant argues, because they indicated they would automatically vote for death, regardless of mitigation. Appellant had used all of his peremptory challenges on others, and these veniremen ultimately served on the jury. Without developing the argument, appellant asserts he had run out of peremptory challenges because he had to strike two other veniremen who should have been removed for cause.

---

1. In fact they had seen wooden yard decorations, and a small woman airing her dog.

■ The State agrees *Morgan* requires the trial court to excuse for cause a venireman who will automatically vote for the death penalty in every case. Such a person must be dismissed for cause because that person will not follow the jury instructions which channel the proper use of evidence in mitigation and aggravation. *See Id.* 504 U.S. at 729, 112 S.Ct. at 2229. The State then argues the two veniremen in question stated they would follow the law, and thus were properly not struck for cause.

■ The standard for striking a prospective juror for cause based on his or her views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath". *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (*quoting Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)); *see Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988); *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

■ Mr. Williams and Ms. Beasley, the jurors who are now challenged, were questioned as to whether they would automatically impose the death penalty. Mr. Williams told defense counsel someone who committed murder while committing robbery would, "[A]utomatically ... deserve the death penalty because he could have went on without hurting anybody." The trial court then asked him if he would consider the sentencing options of life and life without parole also, and if he would be willing to listen to mitigating circumstances. He replied he would. The trial court then asked, "[Would you] not automatically opt for the death penalty,—", and Mr. Williams replied, "No." Defense counsel then asked this venireman, "If you were given certain mitigating and aggravating factors which would be for or against the death penalty in the second stage, would you consider all of those items in determining whether life, life without parole or death is appropriate". He replied, "Yes, ma'am."

Ms. Beasley clearly stated she would consider the facts of the case and each of the punishment options set forth by the legislature, and she promised there would be no situation in which she would automatically decide on punishment. She further stated there was nothing about her personal beliefs that would prevent her from giving "full and open-minded consideration" to the sentences of death, life and life without parole. When asked if there were some particularly heinous murder for which she would automatically vote for death, this juror said there was. The trial court then denied the defense objection for cause.

When we analyze the responses of these jurors in light of the *Witt* standard, we find removal for cause was not necessary. Mr. Williams clearly expressed his ability and intent to follow his oath and the instructions of the trial court. Ms. Beasley also expressed her ability and intent to follow her oath and the trial court's instructions. That she admitted, without benefit of court instruction, that she could imagine a heinous crime in which she would "automatically" vote for death does not negate Ms. Beasley's clear promise to follow the court's instructions and consider all punishment options in *this* case. The trial court properly denied the challenge for cause.

■ The secondary argument that the defendant could have removed these objectionable jurors by peremptory challenge if only he had not been forced to use two other peremptory challenges on other veniremen who should have been removed for cause is unpersuasive. On appellate review we do not address what might have been. Rather, we examine the seated jury panel to determine whether it satisfies the rights of the accused to an impartial jury and due process secured by the Sixth and Fourteenth Amendments. *See Tibbs v. State,* 819 P.2d 1372, 1378 (Okl. Cr.1991); *Ross v. Oklahoma,* 487 U.S. at 88, 108 S.Ct. at 2278. In this case each juror was seated according to state juror selection procedure, and each seated juror expressly promised to be impartial, to consider the facts and to consider each of the sentencing options. We find no error in jury selection.

## II. EVIDENCE OF GUILT/INNOCENCE

Appellant raises three evidentiary challenges. Two of these address the trial

court's denial of a defense motion to suppress evidence; the third challenges the admission of evidence of other crimes.

## A. THE INITIAL TRAFFIC STOP

Appellant was arrested as a result of a traffic stop in Canadian, Texas. The traffic stop was the result of a call from a citizen reporting a suspicious vehicle. Appellant was arrested when he gave inconsistent information and two pistols were seen in the truck. Appellant does not contest the arrest per se.[2] Rather, he argues the fruits of this arrest should have been suppressed, for the arresting officer lacked reasonable suspicion for the initial stop as required by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and *Revels v. State*, 666 P.2d 1298, 1299–1300 (Okl.Cr.1983). Reasonable suspicion was lacking, he claims, for his behavior was consistent with innocent activity.

 To justify a particular seizure, the officer must be able to point to specific and articulable facts which, taken together with rational inferences therefrom, reasonably warrant the stop. 666 P.2d at 1299–1300. The objective standard of sufficiency we apply on appellate review is:

> [W]ould the facts available to the officer at the moment of seizure ... warrant a man of reasonable caution in the belief that the action taken was appropriate? (citation omitted).

666 P.2d at 1300.

 Reasonable cause for a *Terry* stop need not be supported only by facts personally discovered by the stopping officer. *Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972). Thus, facts supplied by a citizen informant which bear sufficient indicia of reliability may provide the basis for an investigatory stop. *Epker v. State*, 753 P.2d 916, 918 (Okl.Cr. 1988); *U.S. v. Basey*, 816 F.2d 980, 988 (5th Cir.1987).

 Preliminary hearing testimony was used in the suppression hearing. It established Deputy Tennant had the following facts at the moment he stopped Knighton. Police dispatcher Carol Ann Wilson radioed and told him Debbie Clark had called to report a mustard yellow Chevrolet pickup truck with Oklahoma tags that had circled her block three times driving very slowly, and the occupants appeared to be "looking over the neighborhood". Deputy Tennant knew Debbie Clark, a lifelong resident of Canadian and the bail bondsman. Deputy Tennant saw a gold colored truck which did not have a state tag on the front and which sped up and headed out of town after the occupants saw him. He noticed the middle person was slumped down. He saw no other truck matching the description given by Clark.

The basis for Debbie Clark's call to the Sheriff was developed by her testimony. She testified she was driving down her street after taking a friend's grandchildren to school when she saw a mustard colored pickup driving five miles per hour down her street. She saw the three occupants looking between the houses and trying to look down the alleys around the houses. The occupants were not looking at the address numbers which are both on the curb and on the homes above the mailbox. This struck Ms. Clark as odd, and she followed the truck. She saw the three peer between the houses on her street, but not after they turned the corner. The person sitting in the middle said something to the driver and the driver turned around and stared at Clark. The driver stopped at an odd angle, then "jerked the pickup" and went down her street again. Clark pulled into her driveway. She went in the house and locked the door, something she didn't ordinarily do. As she watched from her picture window, she saw the truck come up her street a third time. She thought the occupants were going to commit a burglary. Clark called the sheriff's office and spoke to dispatcher Carol Ann Wilson.

Wilson and Deputy Tennant knew Clark to be a person who held a position of responsibility in the community. She articulated

---

**2.** Appellant does argue in his *Brady* claim that the State committed reversible error by withholding the Sheriff's statements about moving items inside the truck before finding a second weapon. We address this argument under the *Brady* heading.

facts to Wilson to support her conclusion the occupants of the truck were behaving suspiciously. Enough of these facts, which had sufficient indicia of reliability, were communicated by Wilson to Deputy Tennant to support a stop. Additionally, Deputy Tennant personally observed the suspicious driving: speeding up and heading out of town as soon as the Deputy was seen. These facts are not, as Knighton argues, equally indicative of innocent or criminal behavior. The trial court properly denied Knighton's motion to suppress fruits of this traffic stop.

## B. STATEMENTS MADE AFTER INVOKING RIGHT TO COUNSEL

■ A *Jackson v. Denno*[3] hearing was held to determine the admissibility of three statements made by Knighton to Oklahoma Investigator Raymond Ham.[4] Knighton invoked his right to counsel when he was given *Miranda*[5] warnings by Texas authorities. While the record is not clear whether the Texas authorities mentioned the Oklahoma crimes, this is immaterial, for once a suspect invokes the Fifth Amendment right against compelled self-incrimination for one offense, the police may not initiate questioning about *any* offense unless counsel is present. *Valdez v. State,* 900 P.2d 363, 373 (Okl.Cr.) *cert. denied,* —— U.S. ——, 116 S.Ct. 425, 133 L.Ed.2d 341 (1995); *Michigan v. Harvey,* 494 U.S. 344, 350, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293 (1990). The State argues Knighton's statements were voluntary and were not the product of police interrogation.

■ At the *Jackson v. Denno* hearing the State bears the burden to prove the challenged statements were voluntary. On appeal the trial court's ruling will be upheld if it is supported by the record. *Smith v. State,* 736 P.2d 531, 533 (Okl.Cr.1987); *Lott v. State,* 586 P.2d 70, 72 (Okl.Cr.1978).

■ The facts developed at Knighton's *Jackson v. Denno* hearing are these. At approximately 5:00 p.m. on January 10, 1990,

Investigator Raymond E. Ham and Noble County Undersheriff Busby came to the Hemphill County jail in Canadian, Texas. They interviewed Williams and Brittain who did not invoke their right to counsel. Knighton had invoked his Fifth Amendment right to counsel when he was given the *Miranda* warnings. Mr. Ham gave Knighton a business card, told him he had been charged with first degree murder in Oklahoma, and told him about the extradition process. Knighton asked Ham what crimes had been charged against Williams and Brittain. Deputy Busby told him they were charged with first degree murder and they were being transported to Noble County. Knighton said he would be executed for this, but he wanted to take care of the kids. Ham told Knighton more about extradition. Then Knighton said he deserved the death penalty but they (Williams and Brittain) had done nothing wrong.

Two hours later Knighton asked to talk to Busby. Ham and Busby returned to his cell and Knighton asked how soon he could be transported to Noble County. Knighton said he could save them a lot of money if he could be transported. He also asked if he was going to McAlester and where Williams and Brittain would go. Then he said he would get the death penalty, but the others didn't deserve it. Ham asked him what he meant by, "he could save them a lot of time and money", and Knighton responded he could, "lay the whole thing out" for them. Ham followed up saying he could do that now, but Knighton said he would rather wait until he returned to Noble County. The next day Ham and Busby transported Knighton to Noble County in a sheriff's unit. During the four hour drive, Knighton said Brittain, whom he had nicknamed, "Pup", deserved what he would get but Renee did not. Chief Ham testified he did not initiate any case-related conversation with Knighton at any time.

---

3. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

4. At the time of trial Mr. Ham was the Ponca City Police Chief; at the time of the investigation

he was an investigator with the Noble County District Attorney's office.

5. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

When the admissibility of a statement or confession is challenged, the burden is on the State to show by a preponderance of the evidence that it was voluntary. *Crawford v. State,* 840 P.2d 627, 635 (Okl.Cr.1992). Logic thus dictates that after the Fifth Amendment right to counsel has attached, there is a presumption that any further statements are not knowingly and intelligently made. The question before us is whether the State carried its burden to overcome this presumption.

The evidence supporting the trial court finding is overwhelming. Knighton controlled his conversations with the Oklahoma authorities. He had a very clear idea of what he wanted to say and what he did not want to say. His statements were voluntary and knowing. The trial court correctly ruled these three statements were admissible. *See Pickens v. State,* 850 P.2d 328, 334 (Okl.Cr. 1993) *cert. denied* —— U.S. ——, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994); *Walker v. State,* 795 P.2d 1064, 1068 (Okl.Cr.1990); *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). Appellant also challenges the incomplete instruction given to the jury on the question of voluntariness of his statements. Instead of giving the standard Oklahoma Uniform Jury Instruction—Criminal 811, the trial court, without objection from counsel, omitted the following paragraph:

> An admission is freely and voluntarily made when, after being informed by the police officers that he has a right to consult with a lawyer and to have the lawyer with him during the questioning, that he has a right to remain silent, and that any statement made by him can be used in evidence against him, an accused, with full understanding of his rights and the nature and consequences of his statements, freely and voluntarily makes a statement which may tend to show his involvement with the alleged crime or to reveal details of it.

This omission is not grounds for reversal. Minimum due process requirements were satisfied by the trial judge who determined

Knighton's statements were voluntary following an *in camera* hearing on the issue. *Hopper v. State,* 736 P.2d 538, 540 (Okl.Cr.1987). By not requesting the omitted paragraph, counsel waived the issue for appellate review. *Id.*

## C. ADMISSION OF OTHER CRIMES EVIDENCE IN FIRST STAGE

The Denny murders occurred on the third day of a four day crime spree. Over defense objection, the many other crimes and attempted crimes which Knighton, Williams and Brittain committed during this four day period were admitted at trial. The State filed a *Burks* [6] notice setting forth the other crimes which it sought to introduce. The *Burks* notice tracked the language of 12 O.S. 1981, § 2404(B) to justify admission: to "prov[e] motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident." Appellant argues this other crimes evidence was not admissible, for it was irrelevant and highly prejudicial. The State argues the *Burks* notice was superfluous for all of the other crimes evidence was admissible as part of the *res gestae* of the Denny murders. *See Reyes v. State,* 751 P.2d 1081, 1083 (Okl.Cr.1988).

Appellant specifically objects to the admission of evidence of the following crimes:

1. Conspiracy to steal vehicle on 1/6/90 in Kansas City;
2. Larceny of a van in Kansas City on 1/6/90 in Kansas City;
3. Conspiracy to commit unspecified robberies and murders while travelling away from Kansas City;
4. Conspiracy to murder and rob Frank Merrifield in Clinton, Missouri on 1/7/90;
5. Murder of Frank Merrifield in Clinton, Mo. with malice aforethought on 1/7/90;
6. Murder of Roy E. Donohue in Clinton, Mo. on 1/7/90;
7. Larceny of a .38 caliber handgun, a .22 caliber handgun, a rifle, a radio and $72 from Frank Merrifield on 1/7/90;

---

6. *Burks v. State,* 594 P.2d 771 (Okl.Cr.1979), *overruled on other grounds Jones v. State,* 772

P.2d 922 (1989).

8. Attempted larceny of a motor vehicle in Sand Springs, Oklahoma on 1/8/90;

9. Conspiracy to rob and murder convenience store employee near Tulsa, Oklahoma on 1/8/90;

10. Burglary of home in Noble County on 1/8/90;

11. Planning and discussing burglary of home in Noble County and urging Brittain to shoot someone on 1/8/90;

12. Attempted shooting of Frank Koehn in Fairview, Oklahoma on 1/9/90;

13. Conspiracy to burglarize home in Canadian, Texas, and rob and kill any occupants on 1/9/90;

14. Discussing intent to shoot police officer near Canadian, Texas on 1/9/90.

Since the trial court admitted this evidence under § 2404(B) of the Evidence Code, we will examine the issue according to this section.

 Title 12 O.S.1981, § 2404(B) does not open the door to admission of crime spree evidence *per se.* That is, the mere fact that an accused commits more than one crime in a defined period of time is not *by itself* sufficient to admit these other crimes into evidence. *See Hammon v. State,* 898 P.2d 1287, 1302 n. 31 (Okl.Cr.1995). To be admissible under § 2404(B), other crimes evidence must be probative of such things as motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. The plain language of the statute indicates probative value is not limited to these enumerated purposes, but our review is limited to these for they are the purposes asserted by the State at trial. Prior to admitting evidence of other crimes, the trial court must weigh its probative value against the danger of unfair prejudice as provided by § 2403. *Stowe v. State,* 590 P.2d 679, 682 (Okl.Cr.1979); 12 O.S.1981, § 2403. If any of the enumerated dangers [7] substantially outweighs probative value, the evidence must be excluded. *Id.*

The State focused on common scheme or plan to justify admission of the challenged evidence. We have often explained:

A common scheme or plan contemplates some relationship or connection between the crimes in question ... · The word, "common" implies that although there may be various crimes, all said crimes must come under one plan or scheme whereby the facts of one crime tend to establish the other such as where the commission of one crime depends upon or facilitates the commission of the other crime, or where each crime is merely a part of a greater overall plan. In such event, the crimes become connected or related transactions, and proof of one becomes relevant in proving the other. However, evidence of other offenses should never be admitted under this exception when it shows that the accused committed crimes wholly independent of that charged. (Citations omitted).

898 P.2d at 1302 (quoting *Luna v. State,* 829 P.2d 69, 72 (Okl.Cr.1992)). In *Hammon* the Court found prior crimes which the State sought to introduce under § 2404(B) were not part of a common scheme or plan and were not admissible. The facts before us now are very different.

Brittain testified that he, Knighton and Williams formed a plan on January 6, 1990, to leave Kansas City so that he would not go to prison. They planned to go to California or Florida, and early on Knighton informed them "there would be robberies and maybe even murders" along the way. This plan was carried out, and almost all of the other crimes evidence the State introduced under § 2404(B) was part of it. The conspiracy to steal, and the stealing of the van in Kansas City explains the motive for Knighton trying to steal another vehicle in Tulsa and Sand Springs, for the group to case the Denny's neighbors, and ultimately for the murder of the Dennys. Knighton thought they had driven the stolen van too long and should replace it. Brittain's testimony linked the weapons used against the Dennys to the robbery and murder of Frank Merrifield and

---

7. The dangers enumerated in § 2403 include unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of

cumulative evidence and unfair or harmful surprise.

Roy Donahue.[8] Each of these other crimes was intricately connected to and facilitated the Denny murders. Evidence of these other crimes thus is admissible under § 2404(B). The probative value of the evidence of each of these crimes is not substantially outweighed by the dangers cited in 12 O.S.1981, § 2304. This evidence was properly admitted.

The other crimes which occurred in Texas are likewise admissible under § 2404(B). The search for another house to "take over" in Canadian, Texas is intricately connected to the Denny murders for Knighton was looking for another vehicle to replace the Denny truck when his suspicious behavior led to a *Terry* stop and ultimately his arrest. His plan to murder the officer who stopped them was driven by his plan to get to California or Florida. The discussion about robbing and murdering a convenience store clerk was also part of Knighton's overall plan, and thus admissible.

██ Not admissible under § 2404(B) is the attempted shooting of Frank Koehn in Fairview, Oklahoma. This attempt arose out of Knighton's anger over paying for an unnecessary car repair, and cannot fairly be called part of Knighton's plan to murder and rob his way to California or Florida. This evidence should not have been admitted in the first stage of trial. However, given the overwhelming evidence of guilt, we conclude the admission of this evidence had no effect whatsoever on the determination of guilt and is harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

██ On the day before trial was to begin the trial court ruled this other crimes evidence was admissible. Defense counsel moved for a continuance, arguing more time was needed to investigate the Missouri murders, and the weapon used in them. The motion was denied. Appellant argues on appeal the trial court thus denied him effective assistance of counsel as well as procedural due process. The State does not specifically respond to this argument.

These bald assertions are not persuasive. The State filed its *Burks* notice twenty days prior to the Court's ruling. Trial counsel thus had ample time to investigate any of the other crimes absent some compelling reason to the contrary. No compelling reason for continuance was presented to the trial court; none has been presented on appeal. The appellant has not carried his burden to show an abuse of discretion by the trial court.

## D. BRADY CLAIM

██ In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held "the suppression by the prosecution of evidence favorable to an accused upon request violate[s] due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97. Under *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. The mere possibility that an item of undisclosed information might have helped the defense or affected the outcome does not establish materiality. In *Kyles v. Whitley,* — U.S. —, —, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995) the Supreme Court held the aggrieved defendant need not show the evidence was insufficient to convict in light of the withheld evidence. Rather to win reversal the defendant need only show the favorable evidence could "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict". — U.S. at —, 115 S.Ct. at 1566. The withholding of material evidence cannot be found to be harmless. *Id.*

Discovery in Oklahoma at the time of appellant's trial was governed by 22 O.S.1981,

---

**8.** Firing tests did not conclusively establish identity of the murder weapon due to the deformed condition of the bullets removed from the body of Mr. Denny, and the bullet found in the Denny's yard after it passed through the body of Mrs. Denny and through the window behind her.

§ 749 and case law.[9] Discovery by the accused of police reports was required under *Brady* only if the defense: (1) did not have independent knowledge and access to them and (2) they contained evidence which was both favorable to the accused and material to guilt or punishment. *Van White v. State,* 752 P.2d 814, 819 (Okl.Cr.1988). Unsworn statements by witnesses to police and officer work product notes were not discoverable at all. *Wilhite v. State,* 701 P.2d 774, 777 (Okl.Cr. 1985). The accused was however entitled to his *own* custodial written statements, and the substance of any custodial oral statements. *Duvall v. State,* 825 P.2d 621, 633 (Okl.Cr. 1991), *cert. denied* 506 U.S. 878, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992); *Watts v. State,* 487 P.2d 981, 986 (Okl.Cr.1971).

Within this context we address appellant's second proposition of error: that his rights to due process under the Fifth, Sixth, Eighth and Fourteenth Amendments were violated by the withholding of requested discoverable evidence until after trial began. Specifically appellant argues: (1) he was denied evidence material to the suppression hearing, the guilt stage of trial, and the punishment stage of trial; (2) he was denied the ability to develop an insanity defense; (3) the trial court denied him a fair trial and effective assistance of counsel by granting him a three day continuance when counsel requested thirty days; and (4) the failure to grant a mistrial or adequate continuance undermined the reliability of the death sentences. These issues are fully preserved by three motions to produce.

On the second day of trial the defense discovered the State had not divulged the content of a custodial oral statement in which Knighton discussed his membership in the Aryan Brotherhood and his acts of violence against Blacks while in prison. Upon questioning by the trial judge, the State produced a 238 page transcript of a statement by Ruth Renee Williams. The trial court dismissed the jury for the day and ordered the prosecutor to disclose "anything whatsoever" concerning statements made by the defendants,

including any reports by Deputy Busby or investigator Ham which concerned Knighton. The following morning defense counsel informed the court she had received 156 more pages of information, and moved for a mistrial. The trial court denied the mistrial, but ordered the State to produce its files for review by the court. As a result of the trial court's inspection, defense counsel received another 200 pages of information. After reviewing this evidence over the weekend, counsel requested a 30 day continuance and the trial court granted a continuance of 3 days. When trial resumed the following Thursday, defense counsel announced, "ready".

The question before us is not whether the prosecutor's acts are condoned by this Court. They are not. Indeed the prosecutor's acts were not condoned by the trial court which acted swiftly and appropriately to cure this egregious error. The question before us is not what should be done to ensure such tactics are not repeated. We have every confidence the trial bench of Noble County can and will address the issue as necessary. The question before us is whether the withheld evidence was material and thus requires reversal in spite of the trial court's best efforts to restore due process.

We determine materiality in light of *Kyles* and *Bagley* which make clear all relevant evidence is not necessarily material. Material evidence is only that which reasonably put the proceeding in such a different light as to undermine our confidence in the resulting ruling. *See Kyles,* —— U.S. at ——, 115 S.Ct. at 1565; *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383.

We begin with that evidence which appellant claims was material to the suppression hearing and could have been used to impeach the State's witnesses:

1. Summary of testimony for Deputy Russell Busby, stating the Hemphill County Sheriff informed the OSBI at the time of the stop the subjects had been held until

---

9. *Allen v. District Court,* 803 P.2d 1164 (Okl.Cr. 1990), *modified by Richie v. Beasley,* 837 P.2d 479 (Okl.Cr.1992), and 22 O.S.Supp.1994, § 2002 have made sweeping changes in discov-

ery in this state. As neither was in effect at the time of appellant's trial, neither has been applied on appeal.

their story could be checked out, with no mention of a firearms violation. Def.Ex. 7A;

2. Deputy Tennant in an interview 1/11/90 stated the truck had no front license plate and he stopped the truck because of the color, and mentions no other factors for the stop. Def.Ex. 65A;

3. Hemphill County Sheriff Billy Bowen in an interview said he found a second weapon after moving items in the truck; at the suppression hearing he said he found gun in plain view. Def. Ex. 66A.

■ The first evidence is an unsworn statement from Sheriff Bowen to Under Sheriff Busby. It is relevant, but it is not material to the suppression hearing. Even if the Deputy reasonably extended the seizure of Knighton while checking on his story, this does not change the fact the Sheriff saw a weapon in plain view which provided just cause for the arrest.

■ The State addresses the second bit of information by arguing the evidence the truck had a front vanity plate rather than a front tag came out at trial. This argument misses the mark for the appellant complains the evidence was material to the suppression hearing. This evidence is not exculpatory and it is embedded within police notes. As such, under *Brady* it is not discoverable; and under *Bagley* it is not material. Deputy Tennant's suppression hearing testimony made clear the front plate was a contributing factor to the stop only to the extent the absence of a front license plate indicated the truck was not licensed in Texas, and Clark reported the truck had an Oklahoma tag. He stopped the Knighton truck based on Clark's report of a suspicious truck, his determination the Knighton truck was the only truck in the area which was close to the description given by Clark, and the fact that he observed the truck speed up and head out of town after the occupants saw him. These facts provide sufficient cause for a *Terry* stop, and show what little importance the front plate had in the stop.

■ The last of the withheld evidence which appellant argues was material to the suppression hearing concerns actions by Sheriff Bowen in discovering a second weapon in the Knighton truck. Again the State focuses on his trial testimony in which the defense cross-examined him using this, by then, discovered evidence. This argument misses the mark, for again, the issue is the impact of the evidence on the suppression hearing. We find the evidence is not material to the suppression hearing, for sufficient evidence was presented to justify the arrest without the discovery of the second gun.

The second category of withheld evidence is claimed to be material to an insanity defense:

1. Knighton's unsworn custodial statement to Texas authorities in the initial interview regarding his high blood pressure. Def. Ex. 1A;

2. Knighton's unsworn custodial statement about membership in the Aryan Brotherhood and his retribution against Blacks in the State penitentiary. Def.Ex. 2A;

3. Knighton's unsworn statement regarding his fears about not having Valium and wanting to return to the penitentiary. Def.Ex. 2A;

4. Sworn and unsworn custodial statements by Brittain, Williams and Texas deputies about Knighton being crazy. Def. Ex. 2A, 9A, 31A, and 42A;

5. Williams' sworn statement that Knighton asked her and Brittain whether he killed someone; that Knighton was drunk and that he jumped around inside the truck when he was asking whether he killed anyone. Def.Ex. 9A.

■ Unsworn statements made by an accused are discoverable. However, this statement was known to the defense at preliminary hearing, and could have been obtained from the independent source of the Hemphill County Sheriff. As such it was not error for the State not to disclose the statement to the defense. We also fail to see how the defendant's statement about high blood pressure is material to an insanity defense.

■ Knighton's oral statements concerning his membership in the Aryan Brotherhood and his hatred of and retribution against Blacks were discoverable and should

have been disclosed to the defense. Defense counsel knew of Knighton's membership, and developed a theory of defense that Brittain murdered the Dennys in order to be initiated into the group. Appellant claims when the entire statement came to light during trial, the defense abandoned this theory. While we appreciate the defense would not want to open the door to the admission of other violent acts committed by the defendant, the record contains nothing to suggest race played any part in the crimes, or the trial. We find nothing material to sanity, innocence or guilt in this statement, and therefore find the failure to disclose it harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. at 24, 87 S.Ct. at 828.

■ The third bit of evidence also was part of an oral statement by Knighton and should have been disclosed to the defense. However, this information was known to the defense as a result of an examination by defense expert, Dr. Evans. Under these circumstances, the evidence is not material and the error in failing to disclose it is harmless beyond a reasonable doubt. *Id.*

■ The fourth group of statements concern Knighton's mental condition. A summary of Deputy Busby's testimony states Knighton told Busby that he thought he had a mental problem, and that if he had been kept on valium he would not "be where [he was] at today". This unsworn custodial statement was discoverable. However, as Knighton made similar statements to defense expert, Dr. Evans, this error is not reversible. A transcribed statement by Ruth Renee Williams stated Knighton had a "scary look in his eyes" after the Missouri shootings. She also said Knighton was hysterical and "going to kill himself". She said Knighton acted like "the mad man" when he woke up periodically as they drove away from the Denny murders and asked, "did I kill, again, did I kill them didn't I." She continued, "Just like if it made him, I don't know like if he didn't kill, he was insane." She also reported Knighton laughed when he shot someone. It is not clear from the record whether this was a sworn or unsworn state-

ment. In another exhibit cited by the appellant, Williams again stated Knighton threatened to kill himself. It is not clear from the record whether this is a sworn or unsworn statement.

Even presuming for the sake of argument these statements were all discoverable, we find they are not material. Knighton told Dr. Evans, "I knew everything was coming to an end, it started two or three days before I went to the motel with Renee".[10] Dr. Evans reported Knighton told him that when he left Kansas City he was "confused and the world was going incredibly fast and he couldn't keep up. He felt like he was actually in another place."

The doctor drew conclusions about the possible behavioral effects of Knighton's withdrawal from Benzodiazepines which could include anxiety, insomnia, anorexia, tremor, sweating, agitation, hypersensitivity to sensory stimuli and other perceptual disturbances, depersonalization, hallucination, delirium, and rage. Under the heading of "Pertinent Impressions" Dr. Evans wrote he was:

> ... impressed with Mr. Knighton's obsessive thoughts about hurting individuals ... Mr. Knighton has more difficulty in controlling his aggressive thoughts when under the influence of stimulants or depressants. Furthermore, the loss of control seems to be exacerbated by the addition of alcohol, and it is my opinion that Mr. Robert Knighton was experiencing pharmacological effects from benzodiazepines, alcohol and imipramine during the time of the alleged shootings. These agents directly contributed to Mr. Knighton's decreased ability to control his violent impulses.

Given this independent information possessed by the defense, the withheld statements concerning Knighton's mental health were not material, and the failure to disclose does not require reversal.

The appellant claims the last category of withheld evidence is material to guilt:

1. A report made by jailer Officer Richard Hansing who recorded a statement made by Knighton to Brittain to "tell them that he (Knighton) did it", Brittain shook

10. This would have been five or six days before the Denny murders.

his head as if to say "no", and Knighton said, "they're already dead, nothing is going to bring them back". Def.Ex. 3A; 2. Knighton had .22 shells on him when he was arrested. Def.Ex. 29A; 3. A written statement by Brittain that Williams picked the Denny house to take over. Def.Ex. 33A.

The first statement was discoverable and came out at trial during Officer Hansing's testimony. The evidence of Knighton carrying the .22 shells was also discoverable, and it was disclosed to the defense prior to Sheriff Brown's testimony and was used by the defense to cross-examine him. The third piece of evidence was before the jury through the testimony of Brittain. As all of this evidence was before the jury in a timely way, the failure to disclose it was harmless beyond a reasonable doubt.

Some of the withheld evidence was material to punishment. The trial judge forced disclosure of this evidence prior to the second stage of trial, and granted the defense an adequate continuance to incorporate it. Counsel announced, "Ready", when trial resumed. The trial judge thus cured this error by decisive and appropriate intervention. Under these circumstances we find the evidence relevant to the second stage was not withheld.

The last withheld exhibit is a file folder titled, "Statements of Robert Wesley Knighton". Appellant argues this exhibit proves the withholding of evidence by the State was not inadvertent. This collateral issue is irrelevant on appeal. Our analysis is the same whether the evidence was withheld in good or bad faith. *Brady*, 373 U.S. at 87, 83 S.Ct. at 1197. As we stated earlier, we have every confidence the bench of Noble County will address this issue if it arises again.

Appellant next argues the trial court had a duty to grant a mistrial, either *sua sponte* or as moved by the defense. The decision to grant a mistrial at defense request is left to the sound discretion of the trial court. *Tate v. State*, 896 P.2d 1182, 1188 (Okl.Cr.1995); *Riley v. State*, 760 P.2d 198, 199 (Okl.Cr.1988). We find nothing to suggest the standard differs for the action *sua sponte*. A trial court abuses its discretion when its ruling is clearly made outside the law or facts of the case. *Walker v. State*, 780 P.2d 1181, 1183 (Okl.Cr.1989).

A mistrial is an appropriate remedy when an event at trial results in a miscarriage of justice or constitutes an irreparable and substantial violation of an accused's constitutional or statutory right. *Valdez*, 900 P.2d at 380. Because the trial judge intervened decisively in this case by (1) ordering discovery, (2) examining the State's files and producing material and (3) granting an adequate continuance, we do not find an abuse of discretion in either the denial of the motion for mistrial or failing to declare a mistrial *sua sponte*. The trial court restored due process to this trial and we find its actions cured the potential error created by the prosecutor.

The appellant next argues the trial court abused its discretion by granting a three-day continuance when defense counsel requested thirty days because counsel was forced to trial unprepared. The record does not support this argument. Counsel announced she was ready to proceed when trial resumed. Counsel used evidence contained in the newly disclosed material to cross-examination witnesses. Counsel used the evidence in mitigation during the second stage of trial. We also note the three-day continuance came after a weekend and a day and a half suspension in trial. Counsel therefore had five days to examine all of the evidence, and six and a half days to examine some of the evidence. The record shows counsel was prepared, therefore the trial court did not abuse its discretion by granting a three-day continuance. For the same reasons we find the three-day continuance was not a denial of a fair trial, due process, or effective assistance of counsel, and it did not undermine the reliability of the death sentence.

In the context arguing the harm caused by the trial court's denial of a 30 day continuance, appellant argues the State failed to comply in good faith with the statutory and constitutional provisions requiring endorsements of witnesses as soon as they are

known to the State and pretrial notice of witnesses the State will call at trial. Counsel does not support this argument with a single fact of record. A bald assertion is not sufficient to raise an issue for this Court's consideration, and we do not address this one.

## PUNISHMENT STAGE

### A. CONSTITUTIONALITY OF AGGRAVATING CIRCUMSTANCES

Appellant begins by challenging the constitutionality of two of the three aggravating circumstances found by the jury: that he created a great risk of death to more than one person, and that there exists the probability that he would commit future criminal acts of violence that would constitute a continuing threat to society. 21 O.S.1981, §§ 701.12(2) and (7).

■ In Oklahoma the jury must find at least one statutorily defined aggravating circumstance in order to consider the death penalty. *Id.* Each aggravating circumstance must channel the jury's discretion by clear and objective standards that provide a meaningful basis for distinguishing the few cases in which the death penalty is imposed from the many in which it is not. It is only in this way that a death penalty scheme does not run afoul of the Eighth Amendment. *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1971); *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980); *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

■ In this case the defendant created a great risk of death to two people and killed them both. The language of this aggravating circumstance is clear and subject to objective review. It is not vague. *See Trice v. State,* 853 P.2d 203, 219 (Okl.Cr.) *cert. denied,* ——— U.S. ———, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993); *Sellers v. State,* 809 P.2d 676, 691 (Okl.Cr.) *cert. denied,* 502 U.S. 912, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991); *Malone v. State,* 876 P.2d 707, 716 (Okl.Cr.1994); *Snow v. State,* 876 P.2d 291, 297 (Okl.Cr.1994) *cert. denied,* ——— U.S. ———, 115 S.Ct. 1165, 130 L.Ed.2d 1120 (1995); *Valdez,* 900 P.2d at 382.

■ Appellant next argues the aggravating circumstance that there is a probability he would commit future criminal acts of violence that would constitute a continuing threat to society is unconstitutionally vague and over broad on its face and as construed. This Court consistently rejects this argument and finds no reason to revisit the matter. *See Snow,* 876 P.2d at 298; *Trice,* 853 P.2d at 220–21.

### B. INSTRUCTIONS ON THE USE OF MITIGATING EVIDENCE

■ Appellant raises five challenges to the instructions regarding the use of mitigating evidence. He first argues the trial court erred by refusing his instruction to the jury that it could return a life sentence regardless of its findings of the relative weight of aggravating and mitigating evidence. This Court has consistently rejected this argument, and we do not find it persuasive now. *See Harjo v. State,* 882 P.2d 1067, 1081 (Okl.Cr.1994), *cert. denied,* ——— U.S. ———, 115 S.Ct. 2007, 131 L.Ed.2d 1007 (1995); *Walker v. State,* 723 P.2d 273, 284 (Okl.Cr.) *cert. denied,* 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1986).

■ In the second challenge appellant argues the court erred by giving what he calls an "antisympathy" instruction. This instruction was given during the first stage of trial and incorporated into the second stage. The instruction stated in relevant part:

You should not let sympathy, sentiment, or prejudice enter into your deliberations, but should discharge your duties as jurors impartially, conscientiously, and faithfully under your oaths and return such verdict as the evidence warrants when measured by these instructions.

This instruction is proper. *See Harjo,* 882 P.2d at 1079; *Fisher v. State,* 845 P.2d 1272, 1277 (Okl.Cr.), *cert. denied,* ——— U.S. ———, 113 S.Ct. 3014, 125 L.Ed.2d 704 (1992); *Stiles v. State,* 829 P.2d 984, 994–95 (Okl.Cr. 1992).

■ Appellant also argues the instructions allowed the jury to ignore mitigating evidence completely. The record does not

support this contention. The jury was instructed by Second Stage Instruction 5:

Mitigating circumstances are those which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or blame. The determination of what are mitigating circumstances is for you as jurors to resolve under the facts and circumstances of this case.

Instruction 6 informed the jurors:

Evidence has been offered as to the following mitigating circumstances: whether these circumstances existed and whether these circumstances are mitigating must be decided by you.

1. Robert Wesley Knighton was a forceps baby, the forceps being used on his head.

2. Robert Wesley Knighton was abused by his father.

3. Robert Wesley Knighton was neglected by his mother.

4. Robert Wesley Knighton was diagnosed as having a learning disability in school.

5. Robert Wesley Knighton was ostracized by his own family due to his father.

6. Robert Wesley Knighton was exposed to six step fathers during his fifteen years of life with his mother.

7. Robert Wesley Knighton left home at fifteen.

8. Robert Wesley Knighton lost a child due to a congenital throat defect.

9. Robert Wesley Knighton was diagnosed as suffering from anxiety attacks.

10. Robert Wesley Knighton was medicated with addictive drugs in the Missouri State Penitentiary for many years including Meprobamate, Valium, Xanax, Aldoril, Diazepam, Capozide, Diphenhydramine and Imipramine.

11. Robert Wesley Knighton was not given proper psychiatric care in the Missouri Department of Corrections after asking on many occasions for help.

12. Robert Wesley Knighton was not equipped to function in the outside world.

13. Robert Wesley Knighton has attempted suicide and has had suicidal tendencies.

14. Robert Wesley Knighton has exhibited exemplary behavior in a prison setting.

The jury was properly instructed and no mitigating evidence was arbitrarily removed from its consideration. *See Pickens,* 850 P.2d at 339.

■ Appellant next argues the trial court erred by not instructing the jury its finding of mitigating circumstances *did not have to be* unanimous. Although cited in support, *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) and *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) do not win the day here. As we explained in *Stiles, McKoy* and *Mills* prohibit a requirement that the jury be unanimous in its finding of mitigating evidence. *Stiles,* 829 P.2d at 997. The trial court did not err by refusing the requested instruction.

■ Finally, the appellant argues the trial court set forth an improper burden of proof when it instructed the aggravating circumstances must be proven beyond a reasonable doubt, and the jury could impose the death penalty if the evidence in aggravation outweighed the mitigating evidence. The trial court instructed the jury properly. *See Romano v. State,* 847 P.2d 368, 392 (Okl.Cr. 1993) *aff'd,* ── U.S. ──, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1993).

### III. MANDATORY SENTENCE REVIEW

■ The legislature has charged this Court to conduct a final analysis in all cases which impose the death penalty to determine (1) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of the statutory aggravating circumstances. We do so now.

The record is very clear; the jury's recommendation and the trial court's sentence were based on the rational application of the appropriate law to the facts of this case. No passion, prejudice, or other arbitrary factor influenced the imposition of the death sentence.

The jury found the State had proven three aggravating factors: (1) the defendant was previously convicted of felonies involving the use or threat of violence to the person; (2) the defendant knowingly created a great risk of death to more than one person, and (3) there exists the probability that the defendant would commit future criminal acts of violence that would constitute a continuing threat to society. *See* 21 O.S.1981, §§ 701.12(1), (2) and (7).

The first aggravating circumstance was proven by the admission of judgments and sentences from the state of Missouri for the crimes of first degree robbery (dated 9/27/68), manslaughter (dated 1/25/74), kidnapping (three counts) (dated 5/15/74), and first degree robbery (dated 8/18/75). One of the kidnapping victims testified to her ordeal as Knighton held her and her family hostage for days after he stole their vehicle.

The second aggravating circumstance was proven by the murders of Richard and Virginia Denny. The third aggravating circumstance was proven by the former convictions along with the murders of Frank Merrifield and Ray Donahue, the attempted murder of Frank Koehn, the attempt to "take over" a home in Canadian, Texas, and statements by the defendant that he wanted to kill the convenience store clerk in Oklahoma and the arresting officer, Deputy Tennant.

The evidence supporting each of these aggravating circumstances is overwhelming. In the final analysis we also must say that without the skillful intervention of trial judge Neal Beekman who conducted a fair trial in the face of serious potential error, reversal might have been necessary. Judgment and sentence is affirmed.

JOHNSON, P.J., CHAPEL, V.P.J., and LUMPKIN and STRUBHAR, JJ., concur.