**Hung Thanh LE, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–95–1303.**

Court of Criminal Appeals of Oklahoma.

Oct. 2, 1997.

Rehearing Denied Nov. 17, 1997.

Irven Box, Stephen Box, Oklahoma City, for Defendant at trial.

William H. Luker, Deputy Division Chief, Capital Direct Appeals, Oklahoma Indigent Defense System, Norman, for Appellant on appeal.

Robert H. Macy, District Attorney, Stephen Deutsch, Assistant District Attorney, Oklahoma City, for the State at trial.

W.A. Drew Edmondson, Attorney General of Oklahoma, Robert Whittaker Assistant Attorney General, Oklahoma City, for Appellee on appeal.

*OPINION*

CHAPEL, Presiding Judge:

Hung Thanh Le was tried by jury and convicted of Count I, Malice Murder in the First Degree in violation of 21 O.S.1991, § 701.7(A); Count II, Robbery with a Dangerous Weapon in violation of 21 O.S.1991, § 801; Count III, Assault and Battery with Intent to Kill in violation of 21 O.S.Supp. 1992, § 652; Count IV, Larceny of a Motor Vehicle in violation of 21 O.S.1991, § 1720; and Count V, Grand Larceny in violation of 21 O.S.1991, § 1704, in the District Court of Oklahoma County, Case No. CF–92–6838. The jury found (1) Le knowingly created a great risk of death, and (2) the murder was especially heinous, atrocious, or cruel. In accordance with the jury's recommendation, the Honorable Nancy L. Coats sentenced Le to death (Count I), ninety-nine years imprisonment (Count II), twenty years imprisonment (Counts III and IV), and five years imprisonment (Count V). Le appeals from these Judgments and Sentences and raises eighteen propositions of error.[1]

This case involves friendship betrayed. Le and Hai Nguyen each fled Vietnam as young men and met in a refugee camp in Thailand. Each made his way to the United States where, by 1992, Le was a machinist in Cleveland while Nguyen owned a beauty shop in Oklahoma City. In July 1992 Le visited Nguyen, his wife Thuy, and their daughter Carolyn. Le stopped for a brief visit early in November 1992, then arrived by taxi around 9:30 p.m. on Monday, November 9, 1992. He spent the night. The following day the beauty shop was closed; the Nguyens loaned Le $200 and they went shopping. On Wednesday Nguyen cut Le's hair, then Le returned to the empty house, where he packed up the Nguyen's stereo and karaoke equipment and shipped it to Cleveland. The Nguyens suspected Le had stolen their property but did not confront him.

Thursday, November 12, Carolyn went to school. Nguyen sat on the couch watching television. Le crept up behind Nguyen and hit him on the back of the head with a bar from Nguyen's weightlifting set. The blows caused several contusions and bled, but Nguyen remained conscious. Thuy was still in bed when Nguyen called her name and said Le was killing him; she rushed into the room. Le dropped the bar and Nguyen picked it up. As Thuy called 911 Nguyen threatened Le with the bar and hit his forearm. Nguyen dropped the bar when Thuy said she had called 911. Le went to the kitchen and got a butcher knife and a meat cleaver. He returned, told Nguyen not to make him do it, backed Nguyen across the room, and stabbed him with the butcher knife. When Thuy begged him to stop, Le attacked her and said she should not have called 911. During the attack Le told the Nguyens he had been paid $20,000 to kill them and told Thuy he would stop if she wrote him a check for $20,000. Nguyen fell across the coffee table, and Le began chopping at his back and head with the meat cleaver. Thuy ran out the back door. She saw an EMSA ambulance which had just arrived, and begged the attendants to go inside and save her husband. The attendants treated Thuy for knife wounds to her hands and head. While waiting for police, they saw Le leave the house and drive off in the Nguyen's car. When attendants reached Nguyen he was still conscious, laying in a large pool of blood. He told them he was dying, asked them to help him, and asked about Thuy. Nguyen went into arrest in the ambulance and died of blood loss. He had been stabbed many times.

Le took Nguyen's car keys, car, and safe deposit box key. He drove to a farm pond near the highway where he washed and changed clothes. He drove to Nguyen's bank, where he used Nguyen's key to open his safe deposit box. He took the contents, including $36,000 in cash and a diamond ring, and put them in an empty bag. Le left the car at the bank and took a taxi downtown,

---

1. The murder occurred in November 1992. On October 18, 1993, Le entered a blind plea of guilty to all the charges. Sentencing was set for December 27. On December 28, Le changed attorneys. After several continuances, Le withdrew his plea on October 28, 1994 (the trial court allowed this because, although Le had an interpreter in the plea hearing, the trial court believed the record did not show Le understood the consequences of his plea). Trial began September 18, 1995. Le waived any speedy trial claims.

where he went shopping and stayed the night.

Le was apprehended the next day at the airport. He admitted stabbing Nguyen but insisted he had not intended to kill him. Le told police he knew about the money in the safe deposit box and came to Oklahoma City to rob the Nguyens. He said he intended to hit Nguyen and "put him to sleep" so he could get the safe deposit box key. When Nguyen remained conscious and grabbed the bar, Le said he feared for his life and got the knives to defend himself. He admitted he told Thuy he had been paid $20,000 to kill them but said that was a lie. During the second stage of trial Le testified that in July, 1992, he gave Nguyen $10,000 to start a joint business; after his family came in September he needed the money but Nguyen refused to return it so he came to Oklahoma City to get it back. Le did not tell the police about $10,000 or a business deal, although he did tell them he knew Nguyen had $10,000. Thuy testified there were no plans for a joint business and Le never gave them any money.

## PRETRIAL ISSUES

In Proposition I Le claims the trial court erred in admitting his custodial statement into evidence over defense objections because the State failed to show that he had sufficient command of the English language to voluntarily, knowingly and intelligently waive his constitutional rights before making the statement. Le was arrested on November 13, 1992, waived his *Miranda* [2] rights, and gave a videotaped statement in which he admitted stabbing Nguyen several times but insisted he had only intended to rob him. Le admits *Miranda* warnings were properly given, but argues his statement should not have been admitted because he could not understand

English well enough to waive his rights. He notes an interpreter was present for preliminary hearing, at least one motions hearing, and trial. He refers to Dr. King's apparent recommendation that Le would be competent if a translator were present for court proceedings (see Proposition V). The State notes no interpreter was present when Le changed counsel or at sentencing, and Le testified without an interpreter in the second stage. Le replies that he of course became more fluent in English during his three years in jail pretrial, and the question is whether Le understood Officers Bemo and Cook in November 1992.

The State must prove a defendant's waiver of rights was (1) the product of a free and deliberate choice rather than intimidation, coercion, or deception, and (2) made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. [3] The State must prove a waiver is valid by a preponderance of the evidence, [4] and must show Le understood English well enough to knowingly and voluntarily waive his rights. [5] This Court will review the totality of the circumstances surrounding the interrogation, including a defendant's characteristics and the details of the interrogation. [6] Where sufficient evidence taken in camera supports a trial court's ruling that a defendant's statements are voluntary and admissible, that ruling will not be disturbed on appeal. [7] The trial court determined Le's statement was uncoerced and voluntary and specifically remarked that the language difference "did not appear to be a problem or represent a barrier at all."

A thorough review of the videotape shows that officers asked some leading ques-

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).

4. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986).

5. *Valdez v. State*, 900 P.2d 363, 371 (Okl.Cr.), *cert. denied*, —— U.S. ——, 116 S.Ct. 425, 133 L.Ed.2d 341 (1995).

6. *Mitchell v. State*, 884 P.2d 1186, 1194 (Okl.Cr. 1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995); *Moran v. Burbine*, 475 U.S. at 421, 106 S.Ct. at 1141.

7. *LaFevers v. State*, 897 P.2d 292, 298 (Okl.Cr. 1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 820, 133 L.Ed.2d 763 (1996). *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), established a defendant's right to an in camera hearing on the voluntariness of his confession.

tions and Le gave some yes-or-no answers. However, most of the questions were open-ended; Le had to comprehend their meaning and formulate answers based on his own knowledge of events. Le also volunteered several statements. At the beginning of the interview Officer Cook said he understood Le spoke fluent English, and Le answered "Not really." Officers read Le his *Miranda* rights and asked whether he understood, and he grunted "Uh-huh" almost inaudibly; Bemo told him to answer yes or no and Le said "Yes." Officer Bemo testified they would have used an interpreter if they thought Le could not understand or communicate with them, but did not believe an interpreter was needed because Le had no difficulty answering their questions, appeared aware of his situation and knew what he was doing. Towards the end of the tape, Cook and Bemo asked Le if he wanted to tell them anything else. Le replied he didn't know what to say, he was confused, and he didn't have a lawyer. When asked if he wanted a lawyer he answered "What for is it?" Le suggests this statement means he did not understand he had a right to an attorney because he did not know what an attorney would do. In context, it appears Le was actually indicating he saw no point in having an attorney since he had given his statement. After this exchange officers told Le Nguyen was dead. During the interview Le signed two search waivers (see Proposition II).

In *Valdez* this Court found a knowing and voluntary waiver where the defendant spoke broken English in simple phrases but understood officers' questions and read and signed waiver forms. *Valdez* considered (1) the lack of specific evidence to support the defen-

dant's lack of comprehension claim; (2) assurances on the record that he understood his *Miranda* warnings; and (3) his "objectively verifiable ability to understand and answer the questions" during interrogation.[8] Le distinguishes *Valdez* on the facts. He notes Le never read or signed a *Miranda* waiver and nobody asked whether he could read English before he signed the rights waivers.[9] Valdez received three *Miranda* warnings, while Le only had one, so he argues there was no opportunity for clarification by repetition. Le argues there is support for his claim of lack of comprehension in the interview itself, where he was confused by the role of an attorney. Le says officers must have doubted his ability to speak English since they said they understood he was *not* fluent in English and he replied "Not really." This misstates the evidence: actually Cook said they understood Le *did* speak very fluent English. Le claims he did not say he understood his *Miranda* rights until Bemo told him to say yes or no; actually he did respond with "uh-huh," but the response is very difficult to hear. Le also points to his *Jackson–Denno* testimony where he testified through an interpreter that he was unfamiliar with this country's criminal justice system, did not "much" understand his right to silence, and thought Bemo and Cook would turn him upside down and put fish salt in his nose if he did not talk to them.

Considering these objections in light of the videotape, taking into account the totality of circumstances surrounding the interrogation, and especially given Le's "objectively verifiable ability to understand and answer" the questions, the trial court's ruling was correct. Le did not appear unduly nervous; he

---

8. *Valdez*, 900 P.2d at 372. Le urges this Court to consider *United States v. Short*, 790 F.2d 464, 468–69 (6th Cir.1986). There, officers took pains to explain *Miranda* warnings to a German defendant, and one officer spoke some German, but the statement was inadmissible since defendant's English was very poor, she had no knowledge of the American criminal justice system, and a magistrate found the defendant could not understand the proceedings without an interpreter. However, in *Short* the defendant's English skills were apparently much worse than Le's, who was able to converse without apparent difficulty, and her written statement was not in her own words, while Le's videotaped statement was clearly his

own. *Short* illustrates a situation where language difficulties may impair waiver, but that situation is not present here.

9. Le relies on *Marquez v. State*, 890 P.2d 980, 985 (Okl.Cr.1995), where officers read the *Miranda* warning but did not ask whether Marquez understood or waived his rights, then neither read nor found out whether Marquez could read the rights waiver before he signed it. This case is clearly distinguishable, since Le told Bemo and Cook he understood his *Miranda* rights and the search waivers were clearly explained (see Proposition II).

understood both the officers' questions and nuances throughout the afternoon; he volunteered several statements and seemed anxious for Bemo and Cook to understand that he had not intended to attempt to kill Nguyen. Le attempts to distinguish between ability to converse—understanding words— and a cultural understanding of what the words mean. He suggests that while he may have understood the words telling him he had a right to a lawyer or a right to silence, he was unable to understand the significance of those rights. He bases this claim on the evidence that he was unfamiliar with our criminal justice system and that, in Vietnam, citizens risked torture if they did not cooperate with police. Le argues Bemo and Cook should have made some effort to ensure that he understood the meaning of the *Miranda* warnings as well as the words with which they were expressed. Police officers must evaluate each situation separately. Where, as here, a defendant objectively appears to understand the questions, is able to communicate in English, and freely gives what appears to be a valid waiver, this Court will not require police to ask about cultural differences. The trial court did not err in admitting the videotaped confession, and this proposition is denied.

■ In Proposition II Le argues the trial court should have suppressed the fruits of the consent searches of his belongings because the alleged consents were the product of an illegal interrogation. Towards the end of the interrogation Le signed search waivers allowing Bemo and Cook to search his briefcase (containing the money and ring) and bags. Cook did not ask whether Le could read English, but read and painstakingly explained each waiver to Le before Le signed. Several times Cook told Le he did not have to consent to these searches. Each time Le indicated he understood Cook's explanation and affirmatively told officers he did not mind if they searched his bags. Le claims the evidence from these searches should not

have been admitted. He relies on his arguments in Proposition I. Since that claim has failed, this proposition must fail as well.

Le argues in Proposition V that the trial court erred in failing to conduct a post-examination competency hearing. In March 1993 Le filed an application for determination of competency. At a March 26 hearing the trial court found sufficient doubt of Le's competency to order an examination. Dr. Edith King apparently submitted her report on April 22, 1993, and indicated Le would be able to rationally assist in his own defense only if a translator was present throughout the course of the legal proceedings. Dr. King's report is not in the record, and this information appears only in Le's subsequent motion for appointment of interpreter. There is no other reference to the competency proceedings and no indication a post-examination competency hearing was held. Le argues this violates the statutory competency proceedings, which require a post-examination hearing.[10] Le claims this hearing is mandatory.

Under Oklahoma's proceedings governing competency in criminal cases, Section 1175.4(A) states a post-examination competency hearing follows a medical evaluation to determine competency. In *Scott v. State* [11] this Court held the § 1175.4(A) post-examination competency hearing is required whether or not a defendant requests that hearing. As recently as 1994 we have repeated this rule when holding that certain circumstances may result in waiver of the otherwise mandatory hearing.[12] The State does not contest Le's claim that, under *Scott,* a hearing should have been held in this case, and merely argues that Le waived the hearing by pleading guilty.

■ This continued reliance on *Scott* is inexplicable. *Scott* interpreted 22 O.S.1981, § 1175.4(A), which stated:

After the doctor, doctors or technicians have made the determination required in

---

10. 22 O.S.1991, § 1175.4(A).

11. 730 P.2d 7, 8–9 (Okl.Cr.1986).

12. *Castro v. State,* 871 P.2d 433 (Okl.Cr.1994) (defendant waived hearing by entering guilty

plea). *Castro,* which interpreted a pre–1991 version of the statute, cited several cases which relied on *Scott* to rule that the hearing was mandatory. All those cases also interpreted pre–1991 versions.

Section 3 of this act, a hearing on the competency of the person shall be held. *Scott* held, not unreasonably, that the final phrase "shall be held", combined with other specific directions in the Act, showed the Legislature's intent that a hearing should be held in each case whether the defendant requested it or not. The Legislature evidently disagreed. The current statute, in effect when Le was tried, reads:

After the doctor, doctors or technicians have made the determination required in Section 1175.3 of this title, a hearing on the competency of the person shall be held *only upon application of the defendant or the state or upon the formal setting of a competency hearing by the court.* [Emphasis added.] [13]

The last clause, added after *Scott,* clearly indicates the Legislature's intent that a hearing under § 1175.4(A) is not mandatory. While *Scott* was an accurate statement of the law as it then existed, the law has changed. A post-examination competency hearing is not mandatory under 22 O.S.1991, § 1175.4(A).

Neither Le nor any other party in the case ever requested a post-examination competency hearing under § 1175.4(A). The statute does not require a mandatory hearing, and the trial court did not err in failing to conduct a hearing. This proposition is denied.

In Proposition VI Le claims the trial court violated his right to a fair and impartial jury by removing a prospective juror for cause before it was established she could not follow the law and consider the death penalty along with the other punishments for first degree murder. Juror Secondi was removed for cause over Le's objection after she indicated she might have a problem assessing punishment because "I don't believe in the death penalty." The trial court asked if, after considering all the evidence and finding Le guilty, Secondi would not consider all three punishments equally, and she replied "Yes." The trial court asked if there were no cir-

cumstances under which she would assess the death penalty, and she replied "No. It takes too long." Le objected and asked any further questioning be done outside the presence of other jurors, but the State moved to excuse her, saying inexplicably that Le could not rehabilitate a juror in a capital case. Le noted Secondi had not yet been asked all the death-qualifying questions but did not want other jurors to hear Secondi's philosophy (whatever it was). The trial court pointed out she did ask whether Secondi could assess the death penalty under any circumstances, and Le objected but admitted Secondi would probably say the "key words" mandating she be excused if she were questioned further. Two other jurors were excused for inability to consider the death penalty; the trial court did not ask significantly more or different questions of those jurors but their statements were straightforward declarations of inability to impose capital punishment.

 A juror may not be excused for cause unless her views would prevent or substantially impair performance of her duties in accordance with her instructions and oath.[14] Le argues correctly that this Court has criticized questioning which did not go to a juror's ability to impose the death penalty as one of three legal alternatives, but the trial court here asked precisely that question. Secondi's unequivocal statements that she did not believe in and would not impose the death penalty under any circumstances allowed the trial court to determine whether her views would prevent or substantially impair the performance of her duties. The trial court did not err in excusing Secondi for cause and this proposition is denied.

In Proposition XVI Le argues he was denied a jury composed of a fair cross section of the community because persons over the age of seventy were systematically exempted from his jury panel. Le claims Oklahoma's statute excusing persons over 70 from jury service deprived him of a jury composed by a fair cross section of the community.[15] Le

---

**13.** 22 O.S.1991, § 1175.4(A).

**14.** *Wainwright v. Witt,* 469 U.S. 412, 423, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985).

**15.** 38 O.S.1991, § 28. The Supreme Court determined defendants were entitled to a jury representative of a fair cross section of the community in *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

admits this Court has consistently rejected this argument,[16] and offers no reason to reconsider these decisions. This proposition is denied.

## ISSUES RELATING TO GUILT OR INNOCENCE

■ Le claims in Proposition III that the trial court erred by refusing to instruct the jury on first degree manslaughter as a lesser included offense to the charge of first degree murder. Le requested an instruction on heat-of-passion manslaughter in the first degree. The trial court specifically found there was no evidence of provocation and denied the request. In a murder case, the trial court must instruct the jury on every lesser included homicide offense supported by the evidence.[17] Whether to instruct on a lesser included offense is a matter of law.[18] Heat-of-passion manslaughter requires evidence that a defendant committed homicide without a design to effect death, in a heat of passion, in a cruel and unusual manner or by means of a dangerous weapon.[19] The elements of heat of passion are 1) adequate provocation; 2) a passion or emotion such as fear, terror, anger, rage or resentment; 3) the homicide occurred while the passion still existed and before a reasonable opportunity for the passion to cool; and 4) a causal connection exists between the provocation, passion and homicide.[20] The State suggests that the instruction is improper wherever there is evidence of intent. This is clearly inaccurate; under that theory a heat-of-passion instruction would never be appropriate where there was evidence of malice murder. The question is whether, in addition to evidence of intent, there was evidence that Le killed Nguyen with adequate provocation, in a heat of passion, without the design to effect death.

■ Evidence does not support this theory. Le relies on his videotaped statement, in which he said he only wanted to knock Nguyen out but Nguyen picked up the bar and hit him on the forearm, causing him to fear for his life. Thuy testified that Nguyen picked up the bar and threatened Le. Le describes the subsequent attack as mutual combat. He suggests that Nguyen became the aggressor by threatening or striking him with the bar. Le suggests when he left the room he was trying to avoid further combat. This characterization ignores the facts that Le left the room, armed himself with a butcher knife and a meat cleaver, and returned to attack Nguyen, who did not attack Le again or defend himself after Le began stabbing him. Nguyen's "aggression" in threatening Le with the bar was actually an attempt to defend himself from Le's initial attack. This is not adequate provocation for heat-of-passion manslaughter. Le left the room to obtain the murder weapons, which he used on his return. This is not an attempt to withdraw from combat.

Le suggests his unreasonable fear of imminent bodily harm mitigated the murder to manslaughter as an "imperfect self defense." Le relies on cases finding that heat of passion can result from fear and anger which precludes rational reasonable thought, but in each case the victim had attacked the defendant without provocation with a dangerous weapon.[21] Le relies on *Smith v. State*[22] and *Camron v. State*[23] for his claim the instruction may be given even without evidence of

16. *See, e.g., Bryan v. State*, 935 P.2d 338, 365 (Okl.Cr.1997); *Fox v. State*, 779 P.2d 562 (Okl. Cr.1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990).

17. *Malone v. State*, 876 P.2d 707, 711 (Okl.Cr. 1994); *Boyd v. State*, 839 P.2d 1363, 1367 (Okl. Cr.1992), *cert. denied*, 509 U.S. 908, 113 S.Ct. 3005, 125 L.Ed.2d 697 (1993).

18. *Boyd*, 839 P.2d at 1367.

19. 21 O.S.1991, § 711.

20. *Charm v. State*, 924 P.2d 754, 760 (Okl.Cr. 1996); *Allen v. State*, 821 P.2d 371, 374 (Okl.Cr. 1991).

21. *Hayes v. State*, 633 P.2d 751, 752 (Okl.Cr. 1981) (victim attacked defendant with knife); *Farmer v. State*, 565 P.2d 1068, 1070 (Okl.Cr. 1977) (victim shot first); *Williams v. State*, 513 P.2d 335, 336–8 (Okl.Cr.1973) (victim attacked defendant with scissors and threatened to cut his heart out).

22. 932 P.2d 521 (Okl.Cr.1996).

23. 829 P.2d 47 (Okl.Cr.1992).

adequate provocation if there is some evidence he used a dangerous weapon without malice. The issue in *Camron* was whether the murder was committed by means of a dangerous weapon or in a cruel and unusual manner, and the opinion did not discuss provocation, but the facts of that case show the victim attacked Camron before the homicide. In *Smith* we did not determine whether the instructions on first degree manslaughter were sufficient since evidence of Smith's brain dysfunction did not negate his intent to kill, but noted that the trial court gave the instruction because evidence showed Smith was provoked when the victim became angry and struck him, fought with him, then grabbed a knife.[24] These cases do not suggest this instruction is appropriate absent evidence of adequate provocation.

Finally, Le relies on *Beck v. Alabama*,[25] where the Supreme Court held that the jury must be instructed on lesser noncapital offenses supported by the evidence in order to provide them with a viable option other than acquittal or death. We have already determined no evidence supported a manslaughter instruction in Le's case. In addition, *Beck* does not apply because the Oklahoma death penalty scheme allows the jury to choose between acquittal, life, life without parole, or death. Oklahoma law provides viable options between acquittal and death, and the jury had the opportunity to express doubts about Le's culpability during the sentencing phase. This proposition is denied.

In Proposition IV Le argues the trial court erred in failing to instruct the jury on self-defense. Le did not request a self-defense instruction at trial, but argues that the trial court should have instructed on self-defense *sua sponte* based on the evidence of his videotaped confession. According to his statement Le struck Nguyen on the head with the bar from the weightlifting set, intending to knock Nguyen out. Nguyen remained conscious and confronted Le; Le dropped the bar and Nguyen picked it up, threatened Le, and hit him on the forearm. Le was afraid for his life, so he went to the kitchen, got knives, returned to the living room, and attacked Nguyen. He admitted he stabbed Nguyen at least five times and no longer considered him a threat after Nguyen fell across the coffee table. Even giving Le the benefit of every possible doubt this evidence does not support a claim of self-defense, which is not available to an aggressor.[26] Le admits he was the original aggressor, but argues that he regained his right of self-defense when he dropped the bar and Nguyen threatened him. On the contrary, Nguyen was exercising his right of self-defense at that point. Even if Le's claim were true, he became the aggressor again when he left the room to arm himself, returned, and again attacked Nguyen. As no evidence supported a self-defense theory, the trial court did not err in failing to instruct on self-defense.[27] This proposition is denied.

Le argues in Proposition IX that his rights to due process, a fair trial, and a fair and reliable sentencing hearing under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated by the admission and display of highly prejudicial and inflammatory photographs. Over Le's objection the trial court admitted nine photographs which showed Nguyen's head, neck, shoulder and arm wounds. The medical examiner used the photographs to explain his testimony to the jury. Le argues the pictures were cumulative and irrelevant. He claims the medical examiner also used charts which showed the location of each wound, and the pictures were not relevant since there was no controversy about the cause of death, location of wounds or any other relevant issue.

Photographs may be admissible to show the nature, extent and location of wounds or to corroborate the medical exam-

24. *Smith*, 932 P.2d at 532.

25. 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

26. *Ruth v. State*, 581 P.2d 919, 922 (Okl.Cr. 1978).

27. *Nance v. State*, 838 P.2d 513, 515 (Okl.Cr. 1992); *Orr v. State*, 764 P.2d 1362, 1364 (Okl.Cr. 1988).

iner's testimony.[28] Otherwise relevant photographs should not be admitted if the danger of prejudice substantially outweighs their probative value.[29] We have remarked that gruesome crimes make gruesome photographs; the question is whether pictures are so unnecessarily hideous as to produce an unfair impact on a jury.[30] The admission of photographs is within the trial court's discretion and this Court will not disturb that ruling absent an abuse of discretion.[31] There was no abuse of discretion here. The photographs show no autopsy procedures and reflect only Le's handiwork.[32] They show the nature, extent and location of Nguyen's wounds and corroborate the medical examiner's testimony. The photographs are disturbing but their prejudicial effect does not substantially outweigh their probative value. This proposition is denied.

Propositions X and XI raise multiple punishment issues. In Proposition X Le claims his conviction for robbery with a dangerous weapon should be reversed and dismissed because that offense and the murder were both incidents to the same course of conduct and were committed to achieve the same objective. Le was convicted in Count I of malice murder and in Count II of robbery with a dangerous weapon. Count I was originally charged in the alternative as malice murder or felony murder, with robbery with a dangerous weapon as the underlying felony. Count II alleged Le used the bar [the Information refers to a "pipe"] and knife to take Nguyen's safe deposit box key and car keys. At trial Le demurred to the evidence of malice murder and unsuccessfully asked that Count I, felony murder, merge with Count II, robbery, so only one count of felony murder would go to the jury.

 Le claims his convictions for robbery and malice murder violate the § 11 statutory prohibition against multiple punishment.[33] In *Hale v. State*[34] we held:

If a single criminal act gives rise to offenses which are not separate and distinct, are a means to another ultimate objective, are lesser included offenses, or are incidents or facets of some other offense, that conduct may not be punished under more than one statute. The elements of the offenses may be dissimilar if they fall into one of these categories. The point of the analysis is neither whether the offenses arise from the same conduct nor whether they must be proved by the same evidence, but whether, taken as a whole, a defendant has been punished twice for one criminal course of conduct where his offenses were incident to one objective.

Le argues the State claimed he used the same force to commit the murder and accomplish the robbery, with the objective of getting the Nguyen's property from their safe deposit box. He contends the murder and robbery were inextricable even though he was convicted of malice murder. Since Count II named both the bar and the knife as the means to robbery, he argues, the jury had to both choose the weapon and determine its manner of use.

Le's claim must fail because (1) he was convicted of malice murder, and (2) Count II named both the bar and the knife. The jury could have found Le guilty of robbery with a dangerous weapon based on his use of the bar to obtain Nguyen's keys. The conviction for malice murder indicates the jury found Le formed the intent to kill separate from the course of the robbery, and evidence showed the murder was committed with the knife and meat cleaver, not the bar. Evidence supports the conclusion that by the time of the murder Le had formed two objectives: to rob Nguyen and to kill him; thus the convictions do not violate § 11. As Le

**28.** *Livingston v. State*, 907 P.2d 1088, 1094 (Okl. Cr.1995).

**29.** 12 O.S.1991, § 2403; *Mitchell*, 884 P.2d at 1196.

**30.** *Livingston*, 907 P.2d at 1094; *McCormick v. State*, 845 P.2d 896, 898 (Okl.Cr.1993).

**31.** *Livingston*, 907 P.2d at 1094; *Mitchell*, 884 P.2d at 1196.

**32.** *Mitchell*, 884 P.2d at 1196. Le's reliance on *Oxendine v. State*, 335 P.2d 940, 943 (Okl.Cr. 1958) is misplaced. There the photographs showed the results of autopsy procedures rather than reflecting the actions of the defendant.

**33.** 21 O.S.1991, § 11.

**34.** 888 P.2d 1027, 1029 (Okl.Cr.1995).

admits, each of these crimes requires proof of facts the other does not, so the convictions do not violate double jeopardy.[35] This proposition is denied.

In Proposition XI Le argues that, if his conviction for robbery with a dangerous weapon is permitted to stand (see Proposition X), then his convictions for larceny of a motor vehicle and grand larceny should be reversed and dismissed. In addition, Le claims his conviction for murder and resulting sentence of death should be reversed because the prejudice resulting from the stacking of these charges violated his rights to due process and a reliable sentencing proceeding. In Count II Le was convicted of Robbery with a Dangerous Weapon for taking Nguyen's safe deposit box key and car keys. In Count IV he was convicted of stealing Nguyen's car, and in Count V he was convicted of grand larceny for taking the contents of Nguyen's safe deposit box. At trial Le asked the court to merge Counts III, IV and V as they were contemporaneous and each act facilitated the others. That request preserved the issue for appeal.

■■■ Le argues these convictions violate both § 11 and double jeopardy. This Court will not engage in traditional double jeopardy analysis unless § 11 does not apply.[36] Applying the test above (see Proposition X) it seems clear that the robbery in Count II was merely a means to the offenses charged in Counts IV and V. As Le argues, he didn't take the car keys and safe deposit box keys for their own sakes; he intended to take the car and steal the money in the safe deposit box. Although each offense requires different proof and comprises a separate act, they are clearly directed at one objective. Counts IV and V must be dismissed.

■■■ Le claims the prosecution stacked these charges purposely to prejudice him. He argues his conviction for murder and his death sentence are unreliable because the jury must have been affected by the list of crimes. A thorough review of the record does not support this claim. The murder conviction surely was the result of Thuy's evidence and Le's videotaped confession. The jury obviously considered the sentence carefully; the fact it did not find one aggravating circumstance charged suggests the jury was not swayed by passion or prejudice. This proposition has merit and Counts IV and V are dismissed, but the remaining convictions and sentences need not be modified.

## ISSUES RELATED TO SENTENCING

In Proposition XII Le argues the evidence was insufficient to prove the aggravating circumstances. The jury found Le created a great risk of death to more than one person[37] and that the murder was especially heinous, atrocious and cruel.[38] This Court will consider whether, in the light most favorable to the State, the evidence is sufficient to support the alleged aggravating circumstance.[39] Evidence supported the jury finding of each aggravating circumstance, and this proposition is denied.

■■■ Le first argues the evidence was insufficient to prove that he knowingly created a great risk of death to more than one person. This aggravating circumstance is proved by a defendant's acts which create a risk of death to another "in close proximity, in terms of time, location, and intent" to the killing.[40] It may be appropriate where only one person is killed, where more than one person is killed, or where more than one person is killed but the murders are not contemporaneous.[41] Le argues that the State failed to prove he knowingly created a

**35.** *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).

**36.** *Hale,* 888 P.2d at 1029.

**37.** 21 O.S.1991, § 701.12(2).

**38.** 21 O.S.1991, § 701.12(4).

**39.** *Charm,* 924 P.2d at 770; *Valdez,* 900 P.2d at 382.

**40.** *Allen,* 923 P.2d at 621.

**41.** *Allen,* 923 P.2d at 621; *Valdez,* 900 P.2d at 382–83; *Snow v. State,* 876 P.2d 291, 297 (Okl. Cr.1994), *cert. denied,* 513 U.S. 1179, 115 S.Ct. 1165, 130 L.Ed.2d 1120 (1995); *Pennington v. State,* 913 P.2d 1356, 1370 (Okl.Cr.1995), *cert. denied,* — U.S. —, 117 S.Ct. 121, 136 L.Ed.2d 72 (1996).

great risk of death. He points to his testimony that he planned to knock Nguyen unconscious in order to rob him and suggests if things had gone according to plan, there would have been no need to attack Thuy. He claims he could not have foreseen that Nguyen and Thuy would try to fight back, and should not be held responsible for his attack on Thuy. He also claims that his attack on Thuy was motivated by a different intent than his assault on Nguyen, and this subsequent attack cannot be used to support this aggravating circumstance.[42]

■ This argument fails to consider all the evidence. The fight in which Nguyen was killed and Thuy injured began not when Nguyen hit Le with the bar, but when Le returned to the room and attacked Nguyen and Thuy with a butcher knife. During the attack, Le threatened to kill Thuy for calling 911, cut her hands and head, and demanded $20,000 to cease the assault. The attacks on Thuy and Nguyen were contemporaneous; Le stabbed Nguyen before attacking Thuy, then struck Nguyen several times with the meat cleaver. His threats to kill Thuy and demand for money did not occur after the attack on Nguyen had finished. Despite Le's testimony, other evidence indicated he intended to harm both victims. Sufficient evidence supports the jury's finding.

■ Le also contends the evidence was insufficient to prove that the murder was especially heinous, atrocious, or cruel. This aggravating circumstance requires proof of conscious serious physical abuse or torture prior to death; evidence a victim was conscious and aware of the attack supports a finding of torture.[43] Le admits that Nguyen was alive and suffered pain during and after the attack. He argues first that this circumstance cannot apply because it requires gratuitous violence beyond the act of killing.[44] Le claims the fight began when Nguyen picked up the bar, and he inflicted Nguyen's wounds to subdue him. Even if this Court adopted those facts the claim would fail. Le admitted to police that he no longer believed Nguyen was a threat after Nguyen fell across the coffee table, but Le continued to hack at Nguyen with the meat cleaver.

■ Le also claims this circumstance should not apply because he did not intend to torture Nguyen or inflict gratuitous pain. He argues that he merely intended to knock Nguyen out and rob him and things got out of hand. He cites cases in which the victims experienced prolonged mental torture as well as physical injury to support his claim that this Court requires proof of specific intent to inflict suffering.[45] Le cites *Robinson v. State*[46] to support his claim that the Court will look at intent and the manner of killing as well as physical suffering. In *Robinson*, the defendant threatened the victim, shot at his feet to make him run, shot him in the back, and looked him in the face as he shot him again. This Court held the ruthless manner of killing and Robinson's pitiless attitude, combined with the victim's physical suffering, satisfied the requirements for this aggravating circumstance. Le mistakes this Court's finding of sufficient evidence in individual cases for requirements of proof. Evidence of a killer's intent to inflict torture or pitiless attitude may in some cases support the jury's finding of this aggravating circumstance, but that evidence is certainly not required in every case.[47] Moreover, even

42. *Allen*, 923 P.2d at 621 (attack driven by intent to escape was separate from earlier attack on victim).

43. *Romano v. State*, 909 P.2d 92, 118 (Okl.Cr. 1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996); *Berget v. State*, 824 P.2d 364, 373 (Okl.Cr.1991), *cert. denied*, 506 U.S. 841, 113 S.Ct. 124, 121 L.Ed.2d 79 (1992).

44. *Hawkins v. State*, 891 P.2d 586, 596–97 (Okl. Cr.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995).

45. *Neill v. State*, 896 P.2d 537, 555–57 (Okl.Cr. 1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 791,

133 L.Ed.2d 740 (1996); *Hawkins*, 891 P.2d at 597; *Berget*, 824 P.2d at 373.

46. *Robinson v. State*, 900 P.2d 389, 402 (Okl.Cr. 1995).

47. *See, e.g., Charm*, 924 P.2d at 771; *Rogers v. State*, 890 P.2d 959, 977 (Okl.Cr.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 312, 133 L.Ed.2d 215 (1995); *Hogan v. State*, 877 P.2d 1157, 1164 (Okl.Cr.1994), *cert. denied*, 513 U.S. 1174, 115 S.Ct. 1154, 130 L.Ed.2d 1111 (1995); *Romano v. State*, 847 P.2d 368, 387 (Okl.Cr.1993), *aff'd*, 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994); *Woodruff v. State*, 846 P.2d 1124, 1147 (Okl.Cr.),

were we to adopt Le's construction his argument would fail. By his own admission Le continued to stab Nguyen long after he was no longer a threat; Le attacked Nguyen's wife and threatened her in front of him; Nguyen was in pain, pleaded for help and knew he was dying. This evidence supports the jury's decision.

■■■■ In Proposition XIII Le argues the evidence in aggravation was not sufficient to support the sentence of death. Le recites the mitigating evidence presented at trial, notes there was no evidence of prior criminal or even bad conduct, and suggests this Court should take into account his age, habit of caring for others, and turbulent history when reviewing the death sentence. He insists that this crime was an aberration in an otherwise good life, describes his arduous escape from Vietnam and the obstacles he overcame before achieving a productive life in the United States, and claims for these reasons the death penalty is unwarranted. Le misunderstands the scope of appellate review. On appeal this Court will independently review the evidence to determine whether it supports the jury's finding of aggravating circumstances.[48] The Court may not substitute its own findings for the jury's where no error occurred.[49] In the mandatory sentence review we determine Le's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor, and we find evidence supports the jury's finding of aggravating circumstances. That is the extent of this Court's review. This proposition is denied.

■■■ Le argues in Proposition XIV that irrelevant victim impact evidence violated his rights. Nguyen's wife Thuy testified about the effect of Nguyen's death on Carolyn and herself. Le did not object to this evidence at trial and has waived all but plain error. Victim impact evidence is intended to provide a "quick glimpse" of a victim's characteristics and the effect of the victim's death on survivors,[50] and should be restricted to the financial, emotional, psychological, and physical effect of the crime itself and some personal characteristics of the victim.[51] Le claims that Thuy's brief testimony was a eulogy with no purpose but to inflame the jury and encourage them to reach a verdict based on emotional factors rather than a "reasoned moral response".[52] The State does not specifically address this argument, claiming only that the issue was waived and in any case the testimony was so brief it could not have been prejudicial. Of course, prejudice is determined not by testimony's length but by its contents.

■■■ In response to questions Thuy described Nguyen as a good man who loved her and Carolyn. She said Nguyen was a talented, hard worker who never complained, but cooked, helped clean, and ironed at home. She said he treated his stepdaughter as his own child, taking her to and from school, and that they had a good time together. Thuy said they were saving their money to put Carolyn in private school and buy a house. She testified things were hard after Nguyen's death: she had nightmares, was scared to look at knives and was very lonely; Carolyn also had nightmares, was quiet, and did not talk or smile for a long time. Thuy had recently remarried but still loved Nguyen, visited his grave often, and wished he were alive. This testimony described the emotional, psychological, and financial effects of the crime as well as describing Nguyen's personal characteristics. It was not unduly prejudicial and well within the bounds of appropriate victim impact testimony.

Le also argues the evidence was irrelevant to any issue properly before the jury. Oklahoma capital juries must weigh aggravating circumstances against mitigating evidence.

---

cert. denied, 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993).

**48.** *Bryan v. State*, 935 P.2d at 365; *Malone v. State*, 876 P.2d 707, 717 (Okl.Cr.1994).

**49.** *Bryan*, 935 P.2d at 365.

**50.** *Cargle v. State*, 909 P.2d 806, 828 (Okl.Cr. 1995); *Payne v. Tennessee*, 501 U.S. 808, 823, 111 S.Ct. 2597, 2607, 115 L.Ed.2d 720 (1991).

**51.** 22 O.S.Supp.1993, § 984; *Cargle*, 909 P.2d at 828.

**52.** *Conover v. State*, 933 P.2d 904, 921 (Okl.Cr. 1997).

Le claims victim impact evidence has no place in this scheme and thus is irrelevant and cannot aid the jury. The legislature has determined that victim impact evidence is both relevant and admissible.[53] Thuy's evidence was relevant and not unduly prejudicial. There is no plain error, and this proposition is denied.

In Proposition XV Le argues the especially heinous, atrocious or cruel aggravating circumstance, as applied by this Court and as defined in the jury instructions, does not perform the narrowing process required of aggravating circumstances because it is unconstitutionally vague and can be applied in any murder case. Le claims the standard instruction for this aggravating circumstance does not sufficiently narrow the category of persons to whom it may apply.[54] He relies on *Maynard v. Cartwright*,[55] in which the Supreme Court held this circumstance unconstitutional and directed Oklahoma to impose a limiting construction which would channel the jury's discretion.

The trial court gave OUJI–CR 436:

As used in these instructions, the term "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.

The phrase "especially heinous, atrocious, or cruel" is directed to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse.

■ Le argues the limitation in the second paragraph is insufficient because a reasonable juror could believe the mere fact of killing amounted to serious physical abuse. On the contrary, that language does not apply on its face to every homicide. This limitation ensures the aggravating circumstance will apply only to cases where the State proves beyond a reasonable doubt that the murder of the victim was preceded by torture or serious physical abuse, "which may include the infliction of either great physical anguish or extreme mental cruelty."[56] Le claims the jury instruction is insufficient because this explanation is not included. We reject the suggestion that "torture or serious physical abuse" needs further definition.

Le cites *Robinson* to support his claim that the Court's interpretation of this aggravating circumstance does not perform a true limiting function. In *Robinson* this Court discussed cases defining "serious physical abuse" and stated:

As much as we would like to point to specific, uniform criteria, applicable to all murder cases, which would make the application of the "heinous, atrocious or cruel" aggravator a mechanical procedure, that is simply not possible. Rather, the examination of the facts of each and every case is necessary in determining whether the aggravator was proved. Unfortunately, no two cases present identical fact scenarios for our consideration, therefore the particulars of each case become the focus of our inquiry, as opposed to one case's similarity to another, in resolving a sufficiency of the

53. 22 O.S.Supp.1993, §§ 984 *et seq.*

54. *Tuilaepa v. California*, 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (aggravating circumstances must define eligibility for the death penalty, may neither be so broad as to include all murders nor be unconstitutionally vague).

55. 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

56. *Cheney v. State*, 909 P.2d 74, 80 (Okl.Cr.1995); see, e.g., *Perry v. State*, 893 P.2d 521, 533–34 (Okl.Cr.1995); *Medlock v. State*, 887 P.2d 1333, 1348 (Okl.Cr.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 310, 133 L.Ed.2d 213 (1995); *Hooks v.*

*State*, 862 P.2d 1273, 1282 (Okl.Cr.1993), *cert. denied*, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994); *Romano*, 847 P.2d at 386; *Berget*, 824 P.2d at 373; *Battenfield v. State*, 816 P.2d 555, 565 (Okl.Cr.1991), *cert. denied*, 503 U.S. 943, 112 S.Ct. 1491, 117 L.Ed.2d 632 (1992); *Foster v. State*, 779 P.2d 591, 592–93 (Okl.Cr.1989), *cert. denied*, 497 U.S. 1032, 110 S.Ct. 3293, 111 L.Ed.2d 801 (1990); *Stouffer v. State*, 742 P.2d 562, 563–64 (Okl.Cr.1987), *cert. denied*, 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988). The Supreme Court upheld similar language in an Arizona statute. *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).

evidence claim supporting the heinous, atrocious or cruel aggravator.[57]

Le suggests this "case-by-case" interpretation does not provide consistent, readily visible factors which guide the jury in determining who is eligible for the death penalty under this aggravating circumstance. He misunderstands *Robinson*. *Robinson* does not suggest that jurors lack "specific, uniform criteria" on which to base their determination, but rather rejects the notion that the criteria for this circumstance may be mechanically applied to all murder cases. Just as the jury in each case must decide, based on the facts of that case, whether a defendant meets the specific criteria for this aggravating circumstance, so must this Court review those jury determinations on an individual basis. *Robinson* does not question the specificity of the criteria for this aggravating circumstance. The limiting criteria provided in the jury instruction sufficiently narrow the determination of who is eligible for this aggravating circumstance. This proposition is denied.

In Proposition XVII Le argues the jury instructions in the punishment stage of the trial did not accurately instruct the jury on the manner in which it was to use and consider evidence in mitigation. Le combines three common complaints about second stage instructions in order to preserve his federal appeal rights. Le neither objected to these instructions at trial nor submitted proposed instructions, and has waived all but plain error. He admits this Court has repeatedly rejected these arguments, and offers no reason for the Court to reconsider earlier decisions. This proposition is denied.

Le first claims the jury instructions failed to inform the jury that its findings regarding mitigating circumstances did not have to be unanimous. He admits this Court has rejected this argument, but asks us to reconsider this issue. He suggests the second stage instructions may be interpreted to require the jury to determine mitigating circumstances unanimously. Oklahoma does not require that the jury unanimously find mitigating circumstances, and the trial court's failure to so instruct is not error.[58]

Next, Le claims the instructions on the issue of mitigation permitted the jurors to ignore mitigating evidence altogether, and seriously diminished the effect of the mitigating evidence present in his case. He argues that Instruction 8, which stated the jury "may" consider circumstances extenuating or reducing moral culpability or blame, created a doubt as to whether the jury should consider mitigating evidence. He claims this possibility was compounded because Instruction 9 listed mitigating circumstances without requiring the jury to consider them, but the instructions listing and defining the aggravating circumstances required jurors to consider those circumstances before they could impose the death penalty. On the contrary, all Oklahoma juries must find an aggravating circumstance before considering a capital sentence.[59] As this Court has often held, the permissive language in Instruction 8 reflects

**57.** *Robinson,* 900 P.2d at 401.

**58.** *Bryan v. State,* 935 P.2d at 364; *Knighton v. State,* 912 P.2d 878, 896 (Okl.Cr.), *cert. denied,* —— U.S. ——, 117 S.Ct. 120, 136 L.Ed.2d 71 (1996). The second edition of the Oklahoma Uniform Jury Instructions, Criminal, contains a definition of mitigating circumstances which specifically informs jurors that unanimous findings of any given mitigating circumstance are not required (OUJI–CR 2d 4–78). This instruction restates settled law. It may assist future juries in their deliberations, but failure to give a similar instruction in this case was not error.

Le complains the jury instructions on mitigating evidence were sandwiched among the instructions for aggravating circumstances, which required unanimity. Instruction 7 defines aggravating circumstances and requires unanimity;

Instruction 8 defines mitigating circumstances and does not discuss unanimity; Instruction 9 lists specific mitigating circumstances and does not discuss unanimity; Instruction 10 requires the jury to unanimously find at least one aggravating circumstance and unanimously find that circumstance outweighs any mitigating evidence before imposing the death penalty; Instruction 11 requires jurors to unanimously find an aggravating circumstance in writing, but requires neither written nor unanimous findings of mitigating circumstances; Instruction 16 requires a unanimous verdict for imposition of the death penalty, life imprisonment or life without parole. The distinctions between aggravating circumstances and mitigating evidence are clear and unambiguous.

**59.** 21 O.S.1991, § 701.11.

the correct constitutional standard and avoids any infringement on the jury's duty to determine individual punishment.[60]

■ Finally, Le argues the trial court erred when it failed to instruct the jurors that they could consider a sentence of life imprisonment or life imprisonment without parole even though they should find the existence of one or more aggravating circumstances beyond a reasonable doubt. A life sentence may be given even if the jury finds aggravating circumstances outweigh mitigating circumstances. However, an instruction to this effect is not required.[61] Le's jury was instructed to impose a noncapital sentence if jurors entertained a reasonable doubt as to his guilt of the charges in the Bill of Particulars.

## ISSUES RELATING TO GUILT OR INNOCENCE AND SENTENCING

■ In Proposition VII Le argues he was deprived of a fair trial and fair sentencing hearing by the improper tactics, remarks, and arguments of the prosecution. Le claims in five subpropositions that prosecutorial misconduct in closing argument poisoned his trial. He objected to only a few comments, and the majority of the proposition is reviewed for plain error only. Both parties have wide latitude in closing arguments to discuss the evidence and reasonable inferences, and this Court will grant relief only where grossly improper and unwarranted argument affects the defendant's rights.[62]

■ Le argues the prosecutor's arguments improperly played upon the jury's sympathy for the victims. In the first stage, the prosecutor contrasted Nguyen's happy home life with his lifeless body lying on a cold slab in the morgue. He told the jury this crime was the result of a broken friendship and emphasized the ways in which Le betrayed Nguyen's trust in him. Le argues that these comments were irrelevant. The first comment may have been irrelevant, but the second series of comments arguably expanded on Le's motive for committing the crime.

In the second stage Le complains of a series of arguments by both prosecutors which essentially suggested it was unfair that Le should live while Nguyen was dead. Prosecutors asked the jury to remember Nguyen's pleas for mercy and consider his daughter's suffering. They noted twice that Nguyen was dead while, if Le lived, he would be well-cared-for and well-fed with visits from his family. The prosecutor contrasted Thuy's description of Nguyen as a hardworking family man with Le, who shopped at Harold's and went to Remington Park. The prosecutor also explicitly asked why Le should be allowed to live while a good man was butchered.

■ The State should not encourage the jury to impose the death penalty out of sympathy for the victims.[63] This Court has specifically condemned many of the comments made in second stage, stating "[t]here is no reason for them and counsel knows better and does not need to go so far in the future."[64] Le persuasively argues that the State's contention—it is unfair for Le to live since Nguyen is dead—creates a super-ag-

**60.** *Rogers*, 890 P.2d at 978; *Pickens v. State*, 850 P.2d 328, 339 (Okl.Cr.1993), *cert. denied*, 510 U.S. 1100, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994).

**61.** *Bryan*, 935 P.2d at 364; *Knighton*, 912 P.2d at 895; *Mitchell*, 884 P.2d at 1206. The second edition of the Oklahoma Uniform Jury Instructions, Criminal, includes an instruction that a jury may impose a sentence of life or life without parole even if the aggravating circumstances outweigh mitigation circumstances (OUJI–CR 2d 4–80). This instruction restates settled law. It may assist future juries in their deliberations, but

failure to give a similar instruction in this case was not error.

**62.** *See, e.g., Spears v. State*, 900 P.2d 431, 445 (Okl.Cr.), *cert. denied*, —— U.S. ——, 116 S.Ct. 678, 133 L.Ed.2d 527 (1995); *Hammon v. State*, 898 P.2d 1287, 1307 (Okl.Cr.1995).

**63.** *Spears*, 900 P.2d at 445; *Walker v. State*, 887 P.2d 301, 321 (Okl.Cr.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995); *McCarty v. State*, 765 P.2d 1215, 1221 (Okl.Cr. 1988); *Jones v. State*, 738 P.2d 525, 529 (Okl.Cr. 1987).

**64.** *Duckett v. State*, 919 P.2d 7, 19 (Okl.Cr.1995).

gravator applicable in every death case. No amount of mitigating evidence can counter this argument, and if the jury agrees they may not even consider mitigating evidence. However, he has not shown that the jury failed to consider the mitigating evidence in his case. The jury evidently was not wholly swayed by counsel's argument since they failed to find one of the charged aggravating circumstances. While the prosecution arguments were certainly error, this claim does not withstand plain error review.

■ Le contends the prosecutor misstated the law during the punishment stage. In second stage final closing the prosecutor told the jury none of Le's evidence amounted to mitigating circumstances, as it did not mitigate, relieve or make any less horrible what Le did, or make Le any less guilty. Counsel objected to the latter comment but the trial court did not rule on the objection and the prosecutor continued argument in the same vein. He argued the instruction on mitigating circumstances did not say anything about whether Le's past behavior was good. Le claims this argument misstated the law regarding mitigating evidence since, of course, the jury is entitled to consider a defendant's character and record as well as the circumstances of the crime in determining mitigating circumstances.[65] The prosecutor's argument was certainly irrelevant. The question is not whether evidence in mitigation makes the defendant any less guilty, or the crime any less horrible, but whether it provides a reason why, despite those things, the defendant should not die. The argument also appears to be improper as purely personal opinion. However, the argument did not clearly tell the jurors they could not consider Le's evidence in mitigation. Le has not shown it resulted in a verdict which was not a reasoned moral response.

■ Le claims prosecutors argued facts not in evidence. In the first stage, the prosecutor argued the victims decided to confront Le about their stolen stereo system the night before the crime. This misstated the facts

but appears to have been inadvertent. Thuy said they suspected Le but had not decided what to do; Le told police that Nguyen accused him of stealing the stereo the morning of the murder. This is not error.

■ Le complains of the prosecutor's theory, argued at length in first and second stage, that he intended to kill the Nguyens before he left Cleveland. There is absolutely no evidence to support this theory, and Le of course claimed he never intended to hurt the victims. The prosecutor and the State contend this is a reasonable inference from the evidence, since Le must have known he couldn't rob the Nguyens and return to Cleveland without their knowledge. Whether or not the inference is reasonable, the jury does not appear to have been affected by this argument. In second stage it specifically refused to find that Le had committed the murder for the purpose of avoiding arrest or prosecution. Had the jury been swayed by this claim, it should have found the avoiding arrest aggravating circumstance. Le cannot show he was prejudiced by this argument, and any error is harmless.

■ Le claims the prosecutor improperly demeaned and ridiculed him. The prosecutor consistently argued Le was cold-blooded and remorseless, calling him cold as an icicle and "very special" in his lack of compassion or feelings. While the State should refrain from unwarranted personal criticism or namecalling, these comments do not reach that level. The prosecutor referred to Le as "small in stature" but that was a reasonable comment on the evidence.

■ Le complains the prosecution argued jurors had a moral duty to find for the State. In both first and second stage closing argument the prosecutor told the jury they could only do justice by finding Le guilty and by bringing in a verdict of death. This Court has warned the prosecutor against this argument before, and we repeat that warning here.[66] The prosecutor did not explicitly state this as his personal opinion, and the

---

**65.** *Eddings v. Oklahoma,* 455 U.S. 104, 114, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982).

**66.** *Hooker v. State,* 887 P.2d 1351, 1367 (Okl.Cr. 1994), *cert. denied,* — U.S. —, 116 S.Ct. 164,

133 L.Ed.2d 106 (1995); *McCarty,* 765 P.2d at 1220–21.

jury could have reached their conclusions after ignoring this evidence entirely, so relief is not warranted.

Finally, Le admits he did not object to most of the comments above but argues their combined effect was so prejudicial as to adversely affect the fundamental fairness and impartiality of the proceedings. Under the circumstances of this case, a thorough review of the record shows the combined effect of the errors in argument did not prejudice Le.

This Court remains "continually astounded that experienced prosecutors jeopardize cases, in which the evidence is overwhelming, with borderline argument." [67] A review of the prosecutors' conduct and comments certainly reveals some error. However, considering the trial as a whole, the improper argument did not contribute to the verdict. This proposition is denied.

In Proposition VIII Le claims counsel was ineffective in the first and second stages of trial. Le must show his attorney's performance is so deficient that he did not have counsel as guaranteed by the Sixth Amendment, and counsel's deficient performance created errors so serious as to deprive him of a fair trial with reliable results.[68] In capital cases, there must be a reasonable probability that, absent errors, the sentencer would have concluded the balance of aggravating and mitigating circumstances did not support a death sentence.[69] There is a strong presumption that counsel's conduct was professional and the defendant must overcome the presumption that counsel's conduct equaled sound trial strategy.[70] This Court will consider counsel's challenged conduct on the facts of the case as viewed at the time and ask if the conduct was professionally unreasonable and, if so, whether the error affected the jury's judgment.[71] If we can

dispose of a claim on the grounds of lack of prejudice, we need not determine whether counsel's performance was deficient.[72] In determining whether counsel's acts or omissions were outside the wide range of professionally competent assistance, we consider whether counsel fulfilled the function of making the adversarial testing process work.[73] Le cannot meet these requirements, and this proposition should be denied.

Le initially claims counsel failed to provide effective assistance in the first stage because he did not subject the State's case for first degree malice murder to meaningful adversarial testing. Le insisted in his videotaped confession and his second stage testimony that he never intended to kill Nguyen, but only wanted to rob him, and inflicted Nguyen's injuries after Nguyen attacked him with the bar. The State argued that Le certainly intended to kill Nguyen by the time he used the knife, and may have formed the intent to kill before he ever reached Oklahoma City. Le claims trial counsel failed to do several things which would have tested and countered the State's theory.

First Le complains that trial counsel failed to cross-examine Thuy Nguyen. He notes several differences between her testimony at trial and preliminary hearing, and suggests the preliminary hearing statements supported his version of the crimes. A thorough review and comparison of Thuy's testimony shows that, even if counsel had brought out each discrepancy, this would not have had the effect he argues. At most, Thuy would have said Nguyen hit Le with the bar, and she picked up the bar and tried to stop Le while he stabbed Nguyen. This does not change the fact that Le remained the aggressor. Thuy's preliminary hearing testimony neither showed this was a "clumsy fight between three people" nor showed ade-

67. *Hammon*, 898 P.2d at 1307.

68. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984).

69. *Bryan*, 935 P.2d at 361; *LaFevers*, 897 P.2d at 306.

70. *Bryan*, 935 P.2d at 361; *Hammon*, 898 P.2d at 1309; *Camron*, 829 P.2d at 55–56.

71. *McGregor v. State*, 885 P.2d 1366, 1381 (Okl. Cr.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995).

72. *Coleman v. State*, 693 P.2d 4, 7 (Okl.Cr.1984).

73. *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066.

quate provocation to support a manslaughter instruction. The evidence certainly would not have supported an instruction for self-defense. Thuy's very graphic trial testimony was largely corroborated by Le's confession and would not have been effectively impeached by bringing out these discrepancies. Trial counsel's failure to cross-examine was a reasonable trial strategy and Le has not shown he was prejudiced by that decision.

■ Le complains trial counsel did not call him to testify in the first stage of trial. He argues the jury should have heard his story that Nguyen owed him $10,000 to show this was more than a simple robbery. He admits counsel may have been shielding Le from cross-examination about why he didn't tell police this story, but argues he had to explain this in the second stage anyway. He argues that, without this story, he lost the opportunity to show the Nguyens visited their safe deposit box after his July visit, which would have corroborated his story. Even if he had been able to show the Nguyens visited the box, inferring they deposited his $10,000, that would neither affect nor overcome the evidence showing he intended to kill Nguyen in November. Counsel understandably wanted the jury to hear this evidence in mitigation of the death sentence, but his decision to omit it from his case in chief was reasonable trial strategy. Le fails to show how he was prejudiced by this decision since whether he intended to rob Nguyen or just retrieve his money, sufficient evidence supported the jury's conclusion that he intended to murder Nguyen.

Le complains that trial counsel did not ask for an instruction on self-defense. No evidence would have supported this instruction and Le was not entitled to it (see Proposition IV). Trial counsel cannot be ineffective for failing to request it.

Finally, Le argues trial counsel was ineffective in closing argument because he did not contest the State's theory that Le came to Oklahoma City intending to kill the Nguyens. Le claims counsel merely asked the jury not to be influenced by race, to follow their oaths, read the instructions, and consider whether Le understood his rights. In fact counsel argued the jury was obliged to be fair and impartial, follow the law, and not be swayed by emotions, and should make the State prove each element of each crime. Counsel argued that Le's confession was not voluntary because he did not understand the proceedings. Counsel compared this case to the O.J. Simpson trial, noting that these officers neither cheated nor planted evidence and this trial was neither a circus nor a mockery, and reminded jurors this was not like television. These comments were reasonable. Le also complains counsel told the jury he did not cross-examine Thuy because he didn't want to insult her intelligence or the jury's. In fact counsel said he did not want to insult Thuy [personally] or the jury's intelligence. Given the first stage evidence, this appears to be a reasonable attempt to ingratiate himself and, by extension, Le, with the jury.

■ Le's dissatisfaction with counsel's closing argument rests on his claim that his videotaped statement amounted to an assertion of self-defense which counsel was obligated to explore. If anything, Le's statement went to heat of passion rather than self-defense (and did not provide sufficient evidence to support a heat-of-passion instruction, see Proposition III). Counsel's failure to argue Le lacked malice did not amount to a concession of guilt. At the same time, the evidence of guilt was unusually strong. Counsel's decision not to argue malice could be a reasonable trial strategy to save his real argument for second stage.

Le also contends counsel failed to provide effective assistance in the punishment stage because he did not object to the State's closing arguments. Le complains counsel failed to object to the State's second stage closing argument implying Le should not live since Nguyen was dead. Counsel did object twice but the trial court failed to rule on each objection. The State's argument is discussed in Proposition VII. Although some of the remarks were improper, those errors required neither reversal or modification. As that is the case, counsel cannot be ineffective for failure to object.

In Proposition XVIII Le claims the accumulation of error in this case deprived Le of

due process of law and a reliable sentencing proceeding. Le argues the combined effect of the errors claimed above deprived him of a fair trial. Where there is no individual error, there is no accumulation of error.[74] A thorough review of the record and Le's propositions shows no prejudicial error occurred other than errors in the State's closing argument, which do not require relief. Although Counts IV and V must be dismissed, these convictions did not affect Le's murder conviction or death sentence. This proposition is denied.

### MANDATORY SENTENCE REVIEW

In accordance with 21 O.S.1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of aggravating circumstances. Upon review of the record, we cannot say the sentence of death was imposed because the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.1991, § 701.13(C).

After careful, independent review and consideration of the evidence supporting the valid aggravating circumstances, as well as the evidence offered in mitigation, we find the sentences of death factually substantiated and appropriate.

Finding no error warranting modification, the Judgments and Sentences of the District Court of Oklahoma County are **AFFIRMED** in part and **DISMISSED** in part.

STRUBHAR, V.P.J., and JOHNSON, J., concur.

LUMPKIN, J., concurs in part/dissents in part.

LANE, J., concurs in result.

LANE, Judge, concurring in results.

I would analyze the victim impact evidence in light of 21 O.S.Supp.1992 § 701.10 and not rely on 22 O.S.Supp.1993 § 994 used by the majority in footnote 52. *See* my vote in

*Ledbetter v. State*, 933 P.2d 880, 902 (Okl.Cr. 1997).

I find that the victim impact evidence in this matter is permissible under § 701.10 as evidence about the victim and impact on the family.

LUMPKIN, Judge, concurring in part/dissenting in part.

I concur in the decision to affirm the Judgments and Sentences for first degree murder, robbery with a dangerous weapon and assault and battery with intent to kill. However, I dissent to the dismissal of the larceny of a motor vehicle and grand larceny convictions. Prosecution and conviction of these last two offenses were not barred by double jeopardy as each was a separate and distinct offense.

Further, Section 11 is not to be used as a shield to allow a defendant the opportunity to commit any number of separate, distinguishable crimes without impunity merely because he may have had a specific ultimate objective in mind. Where a defendant commits offense after offense, he is properly subject to punishment for each offense. I do not find the Legislature has prohibited separate punishments for these offenses under the facts of the case. *See Hale v. State*, 888 P.2d 1027, 1033 (Okl.Cr.1995) (Lumpkin, J., Concur in Results). Using the Court's analysis to its illogical conclusion would mean that since Appellant's objective from the beginning was to steal the money in the safe deposit box, then all crimes committed as a "means to another ultimate objective" could only be punished through the sentencing on that ultimate objective crime. That would mean only the theft of the money from the safe deposit box could be punished in this case. Needless to say, that result would be patently absurd.

Finally, in addressing the claim of ineffective assistance of counsel, the opinion relies on *Strickland v. Washington*. That case has since been clarified in *Lockhart v. Fretwell*, 506 U.S. 364, 369–70, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180, 189 (1993) wherein the Supreme Court stated:

---

**74.** *McGregor*, 885 P.2d at 1385.

[A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him. *See [United States v.] Cronic,* 466 U.S. [648], at 658, 104 S.Ct. [2039], at 2046 [80 L.Ed.2d 657 (1984)].

Therefore, the "ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged," *Strickland,* 466 U.S. at 696, 104 S.Ct. at 2069, and not merely the outcome of the proceedings.